79 A.3d 950

## FALLS GARDEN CONDOMINIUM ASSOCIATION, INC.

v.

## The FALLS HOMEOWNERS ASSOCIATION, INC.

No. 0443, Sept. Term, 2012.

Court of Special Appeals of Maryland.

Nov. 1, 2013.

Reconsideration Denied Dec. 19, 2013.

116

117

Lauren M. Dodrill (Michael Paul Smith, Smith, Gildea & Schmidt LLC, on the brief) Towson, MD, for appellant.

Christopher D. Wolf (Niles Barton & Wilmer, LLP, on the brief) Baltimore, MD, for appellee.

Panel: ZARNOCH, BERGER, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

From 1985 through 2008, the appellant, Falls Garden Condominium Association, Inc. ("Falls Garden"), believed, erroneously, that it held title to sixty-five parking spaces adjacent to one of the buildings in its complex on Clearwind Court in the Summit Ridge area of Baltimore County. Falls Garden used and maintained thirty-nine of those parking spaces exclusively for that period. The parking spaces were actually owned by a neighboring residential community, the appellee, The Falls Homeowners Association, Inc. ("The Falls"). After The Falls asserted its ownership rights over the parking spaces in 2009 by installing signs threatening to tow unauthorized users and by painting curb markers, Falls Garden filed a declaratory judgment action in the Circuit Court for Baltimore County on December 9, 2010, claiming it had obtained ownership of the parking spaces by adverse possession or, alternatively, that it had obtained an easement over the parking spaces by prescription or by necessity. The Falls filed a counterclaim for trespass.

As the trial date approached, the parties attempted to negotiate a settlement. On August 17, 2011, attorneys for both parties executed a letter of intent that stated it was "meant to memorialize certain aspects of a formal Settlement Agreement and separate Lease to be entered into between [Falls Garden] and [The Falls]." The Falls drafted a proposed lease but Falls Garden refused to execute it. On December 20, 2011, The Falls filed a motion to enforce the terms of the letter of intent as a settlement agreement. Falls Garden opposed the motion. On April 18, 2012, Judge Mickey J. Norman held a hearing and granted The Falls's motion.

Falls Garden has appealed Judge Norman's order. Falls Garden contends that Judge Norman erred in interpreting the letter of intent as a binding settlement agreement and in failing to hold a full evidentiary hearing before granting The Falls's motion. We find no error and we shall affirm Judge Norman's decision.

## Facts and Proceedings

The factual dispute giving rise to this litigation is not material to the issues presented on appeal. Instead, we are concerned with the litigation itself. As we have noted, Falls Garden filed its complaint seeking a declaratory judgment on December 9, 2010. The Falls filed an answer and counterclaim on February 14, 2011. The original trial date was May 27, 2011. At a settlement conference on May 12, 2011, the parties made progress toward a settlement but attorneys for The Falls did not have the requisite authority to settle the case on that day. The parties filed a joint motion for a continuance, which was granted. Trial was rescheduled for August 17, 2011. The parties made further progress at a second settlement conference on August 11, 2011. On August 15, 2011, the parties filed a second joint motion for a continuance, noting that they had reached an agreement in principle but needed "more time to memorialize the terms of the agreement which includes the preparation of a lease for a term of 99 years." The motion also predicted that such agreement would be drafted and executed within ninety days, at which point the parties would file a motion to dismiss the complaint and counterclaim with prejudice.

Between August 11 and August 18, 2011, attorneys for both parties continued to negotiate via e-mail. These negotiations resulted in a "Letter of Intent" dated August 17, 2011.[1] We reproduce here the text of the Letter of Intent, in full:

This Letter of Intent dated this 17th day of August, 2011, is meant to memorialize certain aspects of a formal Settlement Agreement and separate Lease to be entered into between Falls Garden Condominium, Inc. ("Falls Garden") and The Falls Homeowners Association, Inc. ("The Falls").

The proposed Lease will contain the following provisions:

---

1. It appears from the e-mails between counsel in the record that Falls Garden did not actually execute and deliver the Letter of Intent until August 18, 2011.

1. The term of the Lease will be 99 years, with The Falls as Lessor and Falls Garden as Lessee;

2. The property to be leased will be 24 parking spaces on the east side of Clearwind Court;

3. The 24 parking spaces will start at the island closest to Falls Garden Condominium Building #1 (6927–6933 Clearwind Court) on the northerly end of Clearwind Court and run continuously southerly toward Ten Timbers Lane;

4. The rent will be $20.00 per month per parking space;

5. The parking spaces shall be maintained, repaired and replaced by Falls Garden;

6. Falls Garden shall be responsible for any real estate taxes assessed against the 24 parking spaces;

7. Falls Garden shall carry insurance in amounts reasonably requested by The Falls for liability and property damage;

8. Falls Garden shall indemnify The Falls with respect to any claims occurring on the 24 parking spaces;

9. The Lease shall contain the usual and customary provisions regarding dates and methods of payment, provisions for default and breach, severability, signs, quiet enjoyment, waiver, and the like.

The proposed Settlement Agreement will contain the following provisions:

1. The case filed by Falls Garden Condominium, Inc. against The Falls Homeowners Association, Inc., and the counterclaim filed by The Falls, in the Circuit Court for Baltimore County, Civil Case No. 03–C–10–013994, will be dismissed with prejudice;

2. Falls Garden will release The Falls from any claim of ownership of the 39 parking spaces on the east side of Clearwind Court running from Falls Garden Condominium Building #1 (6927–6933 Clearwind Court) southerly to Ten Timbers Lane;

3. On and after the date of the Lease and for the entire term of the Lease between the parties, Falls Garden may, but is not obligated to place signs on its property or on the 24 leased parking spaces indicating that they are exclusively for the use of the Unit Owners in Falls Garden and that Falls Garden shall have the right to tow any unauthorized vehicles from those parking spaces;

4. Neither party will take any action to disturb the status quo of head-in parking along Clearwind Court. However, if Baltimore County alters the current manner of head-in parking, the Lease will continue to encompass the land area that currently composes the 24 parking spaces that are the subject of the Lease.

5. The Falls shall prepare the Lease and submit the same to Falls Garden for review, comment and execution;

6. All costs attendant to the recording of the lease shall be paid by Falls Garden, in advance of recording among the Land Records of Baltimore County by The Falls;

7. The Settlement Agreement shall contain the usual and customary provisions found in settlement agreements regarding claims to property and the like.

This Letter of Intent and the undertakings of The Falls as to the Settlement Agreement and the Lease are contingent and conditioned upon the Board of Directors of The Falls obtaining the affirmative vote of two thirds (2/3) of the members of the Homeowners Association to Lease the property described above.

Signed and dated the date first written above by the respective attorneys for Falls Garden Condominium, Inc. and The Falls Homeowners Association, Inc.

The document was signed by P. Michael Nagle, as attorney for Falls Garden, and Michael H. Mannes, as attorney for The Falls.

The Falls obtained the approval of two thirds of its membership to lease the parking spaces. Counsel for The Falls drafted a proposed lease and submitted it to counsel for Falls Garden on November 3, 2011 "for review and approval." According to The Falls, Falls Garden then ceased communication. On November 21, 2011, The Falls learned that Falls Garden had obtained new counsel. On November 22, 2011, The Falls contacted Falls Garden's new counsel, who inquired about "returning to pre-litigation status." On December 20, 2011, The Falls moved to enforce the August 17 Letter of Intent as a settlement agreement. Falls Garden opposed the motion, arguing that the parties did not intend to be bound until a lease and settlement agreement had been drafted and executed, and stating that Falls Garden objected to numerous terms in the proposed lease.

Judge Norman held a hearing on The Falls's motion on April 18, 2012. After hearing argument of counsel and reviewing the documents the parties had submitted, Judge Norman made the following oral findings:

[T]he Court finds that the parties had negotiated or attempted to negotiate a final resolution to this matter and the question then becomes whether or not the letter of intent constitutes a contract and, as both counsel knows, letters of intent can constitute a contract and in one of the cases that [counsel for Falls Garden] cited, there's actually a discussion concerning how letters of intent are generally looked at in four broad areas and they talk about various extremes and one extreme is the party may say specifically that they intend not to be bound until a formal writing is executed. There's, there's no specific language that this Court can find, either in the letter of intent or in the negotiations back and forth to [create] the letter of intent, that that is specifically contemplated. At the other end of the extreme is the, the review of the letter of intent to determine whether the intent of the parties was to be bound by what was contained in the letter of intent that was ultimately simply, and I say simply, to be reduced to writing. Based on what this Court has reviewed in terms of

the negotiations, the letter of intent. The letter of intent could have been simply signed by both parties and constituted, in this Court's judgment, constituted the agreement that the parties have reached. The Court finds, as a matter of law and fact, that the parties did enter into an agreement that was memorialized in the letter of intent, therefore, the request to enforce the agreement will be granted.

Judge Norman issued a written order on April 26, 2012. This order directed The Falls to prepare a settlement agreement and release of all claims, consistent with the Letter of Intent, and directed Falls Garden to execute the settlement agreement and the lease that had already been drafted within five days of receipt. The order also provided that the complaint and counter-complaint would be dismissed with prejudice within ten days of the lease and settlement agreement being executed. By order of July 24, 2012, the matter was stayed pending the resolution of this appeal.

## Discussion

■ Falls Garden contends that the August 17, 2011 Letter of Intent was not a valid and enforceable settlement agreement because it did not represent the parties' final agreement. Falls Garden argues that the Letter of Intent was a "framework" that set forth only some material terms on which the parties agreed. Falls Garden maintains that the parties intended not to be bound until a subsequent writing was executed, specifically the lease and settlement agreement mentioned in the Letter of Intent. To show this intent not to be bound, Falls Garden relies on the fact that the parties had said in their August 15, 2011 joint motion for a continuance that they needed more time to memorialize the terms of their agreement and a motion to dismiss would be filed "once the agreement is properly executed," but neither party sought to dismiss the case after the Letter of Intent was executed on August 17.

Falls Garden also reiterates its objection to numerous terms of the proposed lease, including: forfeiture of the lease upon the occurrence of certain events; limitation of The Falls's tort

liability; Falls Garden's responsibility for taxes other than real estate taxes; Falls Garden's responsibility for maintenance other than surface repairs; The Falls's demand that Falls Garden procure $1 million in insurance coverage, which could be increased; waiver of the right to bring counterclaims; waiver of the right to a jury trial; a fee-shifting provision; and the omission of other terms which Falls Garden would have liked to have been a part of the lease, such as a provision regarding the responsibility for towing unauthorized vehicles.

The Falls contends that Judge Norman properly enforced the Letter of Intent as an executory accord. In The Falls's view, the Letter of Intent was itself the parties' agreement to conclude the litigation, and the lease and settlement agreement referenced in the Letter of Intent were merely ancillary documents that were necessary to carry out that agreement. The Falls argues that the fact that the memorialized agreement was styled a "letter of intent" is not controlling, and points out that the document does not state that the parties intended not to be bound by it. The Falls maintains that, in the Letter of Intent, the parties formed an enforceable agreement by exchanging mutual promises for consideration. Specifically, The Falls agreed to lease twenty-four parking spaces to Falls Garden in exchange for $20.00 per space per month for a term of ninety-nine years. Upon performance of that agreement—i.e., execution of the lease—the parties would dismiss the action and release all claims against each other. According to The Falls, it performed its obligations by obtaining the approval of two thirds of its membership, drafting a lease, and submitting it to Falls Garden. In asking Judge Norman to specifically enforce the Letter of Intent, The Falls was merely seeking the benefit of its bargain.

▆▆▆▆ Our resolution of this appeal turns on whether the August 17 Letter of Intent is an enforceable agreement. It is an accepted principle that settlement agreements are treated no differently than other contracts.

Settlement agreements are enforceable as independent contracts, subject to the same general rules of construction

that apply to other contracts. As long as the basic require-
ments to form a contract are present, there is no reason to
treat such a settlement agreement differently than other
contracts which are binding. [W]here the contract is fair,
reasonable and certain, a court of equity can decree specific
performance. The interpretation of a contract, including
the determination of whether a contract is ambiguous, is a
question of law, subject to *de novo* review by an appellate
court.

*Erie Ins. Exchange v. Estate of Reeside*, 200 Md.App. 453,
460–61, 28 A.3d 54, 58 (2011) (citations and quotations omit-
ted). Thus, settlement agreements are subject to the familiar
requirements of contract formation. As the Court of Appeals
explained in *Cochran v. Norkunas:*

> It is universally accepted that a manifestation of mutual
> assent is an essential prerequisite to the creation or forma-
> tion of a contract. Manifestation of mutual assent includes
> two issues: (1) intent to be bound, and (2) definiteness of
> terms. Failure of parties to agree on an essential term of a
> contract may indicate that the mutual assent required to
> make a contract is lacking. If the parties do not intend to
> be bound until a final agreement is executed, there is no
> contract.

398 Md. 1, 14, 919 A.2d 700, 708 (2007) (citations omitted).
Maryland courts adhere to the objective theory of contract
interpretation.

> A court construing an agreement under [the objective
> theory] must first determine from the language of the
> agreement itself what a reasonable person in the position of
> the parties would have meant at the time it was effectuated.
> In addition, when the language of the contract is plain and
> unambiguous there is no room for construction, and a court
> must presume that the parties meant what they expressed.
> In these circumstances, the true test of what is meant is not
> what the parties to the contract intended it to mean, but

what a reasonable person in the position of the parties would have thought it meant.

*Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006).

The fact that the August 17 document was styled a "letter of intent" instead of some other title suggesting more finality does not necessarily mean that it is an unenforceable "agreement to agree." *See Horsey v. Horsey*, 329 Md. 392, 420, 620 A.2d 305, 319 (1993) (discussing unenforceability of agreements to agree). The controlling inquiry is whether or not the parties objectively intended to be bound by the terms of the Letter of Intent. The parties' subjective intent is irrelevant. *See, e.g., Ocean Petroleum Co., Inc. v. Yanek*, 416 Md. 74, 86–87, 5 A.3d 683, 690 (2010) ("Rather than acquiescing to the parties' subjective intent, we consider the contract from the perspective of a reasonable person standing in the parties' shoes at the time of the contract's formation. Thus, 'the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.' ").

In *Cochran*, the Court noted that "[l]etters of intent have led to 'much misunderstanding, litigation and commercial chaos,' " but explained that they can be classified into four categories. 398 Md. at 12–13, 919 A.2d at 707. The Court quoted with approval from 1 CORBIN ON CONTRACTS § 2.9, pp. 157–58 (Joseph M. Perillo ed., Rev. ed.1993):

(1) At one extreme, the parties may say specifically that they intend not to be bound until the formal writing is executed, or one of the parties has announced to the other such an intention. (2) Next, there are cases in which they clearly point out one or more specific matters on which they must yet agree before negotiations are concluded. (3) There are many cases in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts. (4) At the opposite extreme are cases like those of the third class, with the addition that the parties expressly state that they intend

their present expressions to be a binding agreement or contract; such an express statement should be conclusive on the question of their "intention."

398 Md. at 13, 919 A.2d at 707–08. "A valid contract generally has been made if a letter of intent properly falls within either the third or the fourth category." *Id.* at 14, 919 A.2d at 708. In *Cochran,* the Court held that parties to a real estate transaction did not intend to be bound by a letter of intent that stated that a "standard form Maryland Realtors contract will be delivered ... within 48 hours" and that "describe[d] how certain terms of that contract will be construed." *Id.* at 20, 919 A.2d at 712. The Court relied on the following language from *Peoples Drug Stores, Inc. v. Fenton Realty Corp.:*

If ... it appears that the parties, although they agreed upon all the terms of the contract, intended to have them reduced to writing and signed before the bargain should be considered as complete, neither party will be bound until that is done, as long as the contract remains without any acts done under it on either side.

191 Md. 489, 494, 62 A.2d 273, 275–76 (1948). On the other hand, the *Peoples Drug Stores* Court also said:

If it appears that the terms of the contract are in all respects definitely understood and agreed upon, and there is nothing left for future settlement, and that a part of the understanding of the parties is that a written contract embodying these terms shall be executed by them to serve merely as evidence of their agreement, the mere fact that the parties understood that the contract should be reduced to writing does not leave the transaction incomplete and without binding force.

*Id.* at 493–94, 62 A.2d at 275.

In this case, there was no statement in the Letter of Intent regarding whether the parties did or did not intend to be bound by the document, ruling out Corbin's categories one and four. The Letter of Intent did not point out any specific matters requiring further agreement, ruling out category two.

That leaves category three, where "the parties express definite agreement on all necessary terms," but perhaps "say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts." *See* 398 Md. at 13, 919 A.2d at 707–08. The Letter of Intent in this case falls into Corbin's third category and is, therefore, enforceable.

In the Letter of Intent, the parties agreed that The Falls would lease twenty-four of the disputed parking spaces to Falls Garden—specifically, the twenty-four spaces on the east side of Clearwind Court starting "at the island closest to Falls Garden Condominium Building # 1 (6927–6933 Clearwind Court) on the northerly end of Clearwind Court and run[ning] continuously southerly toward Ten Timbers Lane"—for a term of ninety-nine years at a rate of $20.00 per space per month. Falls Garden would be responsible for maintenance and real estate taxes. Falls Garden would carry insurance "in amounts reasonably requested by The Falls for liability and property damage" and would "indemnify The Falls with respect to any claims occurring on the 24 parking spaces." Falls Garden would have the right to place signs on its property or on the leased parking spaces indicating "that they are exclusively for the use of the Unit Owners of Falls Garden and that Falls Garden shall have the right to tow any unauthorized vehicles from those parking spaces." The parties agreed that, in the event that Baltimore County altered "the current manner of head-in parking," the lease would continue to encompass the land area currently occupied by the twenty-four spaces. The then un-drafted lease would also contain "the usual and customary provisions regarding dates and methods of payment, provisions for default and breach, severability, signs, quiet enjoyment, waiver, and the like." The agreement was contingent only on The Falls obtaining the consent of two thirds of its membership.

Judge Norman correctly found that the Letter of Intent contained all necessary terms of the parties' basic agreement to lease twenty-four specific parking spaces for a term of ninety-nine years at a rate of $20.00 per space per month.

Judge Norman also correctly found that the Letter of Intent did not suggest, on its face, that the parties intended not to be bound by it. Accordingly, Judge Norman properly found that the Letter of Intent was an enforceable agreement. Any contemplated subsequent writing would serve merely as evidence of that agreement.

As the Letter of Intent was an enforceable agreement, it operated as an executory accord.

> The term "accord executory," more commonly referred to as an "executory accord," means an agreement for the future discharge of an existing claim by a substituted performance. An executory accord is a compromise. A claimant or creditor promises to discharge the claim or debt of another after the other completes a promised performance. Therefore, an agreement falls within this definition if the performance promised discharges an existing claim and not the promise to render the performance.

13 CORBIN ON CONTRACTS § 69.1 p. 273 (Joseph M. Perillo ed., Rev. ed.2003). In *Clark v. Elza*, 286 Md. 208, 219, 406 A.2d 922, 928 (1979), the Court of Appeals adopted the "modern view" that executory accords are enforceable bilateral agreements, assuming they meet the ordinary requirements of contract formation. The Court explained the effect of an executory accord as follows:

> [A]n executory accord does not discharge the underlying claim until it is performed. Until there is a breach of the accord or a justifiable change of position based upon prospective non-performance, the original cause of action is suspended. As long as the "debtor" (i.e., the defendant in a tort case) neither breaches the accord nor provides a reasonable basis for concluding that he will not perform, the "creditor" (i.e., the plaintiff) has no right to enforce the underlying cause of action.

286 Md. at 217, 406 A.2d at 927. In *Clark*, a personal injury suit, the parties orally agreed to settle the case for $9,500. The plaintiff subsequently demanded more money, and the defendant moved unsuccessfully to enforce the settlement.

The Court of Appeals held that the oral agreement was an enforceable executory accord that suspended the underlying tort claim and, therefore, the defendant's motion to enforce should have been granted.

Applying that framework to this case, Falls Garden agreed to discharge its claim against The Falls in exchange for a leasehold interest in twenty-four of the disputed parking spaces. The parties memorialized the essential terms of this agreement in the Letter of Intent, which, as we have explained, was an enforceable agreement. The Letter of Intent suspended Falls Garden's claim until such time as The Falls breached the agreement or provided a reasonable basis for concluding that it would not perform. The Falls performed its obligations by obtaining the consent of two thirds of its membership and drafting a proposed lease. The lease was consistent with the terms specified in the Letter of Intent. It was more detailed than the Letter of Intent in some respects—for example, it spelled out the provisions for default and specified the amount of necessary insurance coverage, both of which the Letter of Intent had specifically left open—and it set forth a few new terms, such as a fee-shifting provision and waiver of the right to a jury trial. Nevertheless, these additional details and terms, though relevant, were not essential to the parties' basic agreement to lease twenty-four parking spaces for a term of ninety-nine years at a rate of $20.00 per month per space. Falls Garden was obligated to return The Falls's performance by executing the proposed lease. When Falls Garden refused to do so, The Falls was entitled to seek specific performance. Conversely, as The Falls had performed, Falls Garden could not enforce its underlying claim—i.e., Falls Garden could not pursue its complaint for adverse possession.

The fact that the Letter of Intent contemplated the drafting of a settlement agreement subsequent to the execution of the lease is consistent with the notion that the Letter of Intent operated as an executory accord. Upon performance of the accord—i.e., execution of the lease—the parties' claims against each other would be discharged. Although this would occur as

a matter of law, it would be natural for the parties to memorialize this in a subsequent writing and to file a stipulation of dismissal with the court as required by Rule 2–506. In the same vein, Falls Garden's reliance on the fact that neither party sought to dismiss the case immediately after the Letter of Intent was executed, as evidence of the parties' intent not to be bound, is inconsistent with the mechanics of an executory accord. There would have been no reason to dismiss the case immediately after the Letter of Intent was executed, because the underlying claims were merely suspended, not discharged, pending execution of the lease.

Falls Garden also contends, relying on *David v. Warwell,* 86 Md.App. 306, 586 A.2d 775 (1991), that Judge Norman erred in granting The Falls's motion without a plenary hearing when the existence of the agreement was contested. Falls Garden claims that Judge Norman improperly accepted The Falls's proffer over its own in terms of whether the parties intended to be bound by the Letter of Intent. In Falls Garden's view, Judge Norman was required to take testimony to resolve the parties' contradictory assertions, without which there was insufficient evidence to support the existence of an agreement.

The Falls contends that a plenary hearing was not required in this case. The Falls takes the position that the court did not need to take testimony regarding the parties' intent because the Letter of Intent was unambiguous. Unlike in *David,* which concerned an oral settlement agreement, Judge Norman had before him a written agreement signed by the parties' attorneys. The Falls maintains that this was sufficient evidence to support Judge Norman's decision. The Falls also asserts that Falls Garden could not have been erroneously denied a plenary hearing because it never actually requested one.[2]

---

2. The Falls suggests in its brief that, in a status conference immediately before the April 18 hearing, "both parties stated that they would proceed on the exhibits attached to their motions and that witness testimony would not be necessary." It appears that this status conference was not recorded, or at least not transcribed, and so we are not able to consider this assertion on appeal.

Our review of the transcript of the hearing before Judge Norman confirms that Falls Garden did not request a full evidentiary hearing. At best, counsel for Falls Garden proffered that he could produce testimony that would support his client's position.

> The terms of the proposed lease are not acceptable to [Falls Garden] and I would proffer, Your Honor, that *I have people here who can testify if you need to hear.* That their understanding was that they didn't have an agreement until things were negotiated, signed and executed.

(Emphasis supplied). Ordinarily, a trial court does not err in failing to take testimony when the parties have not requested that it do so.

In any event, whether requested or not, an evidentiary hearing was not necessary in this case because there was sufficient evidence to support Judge Norman's decision. The Letter of Intent unambiguously set forth all the essential terms of the parties' agreement and would lead a reasonable observer to conclude that the parties intended to be bound by it. Witness testimony to the effect that one party subjectively intended not to be bound by the Letter of Intent would have been unnecessary and, as the Letter of Intent was unambiguous, irrelevant. Unlike in *David,* 86 Md.App. at 320–21, 586 A.2d at 782–83, where we held that a court may not find the existence of an oral settlement agreement in the total absence of any evidence at all, Judge Norman had before him a written document signed by attorneys for both parties, the authenticity of which was not contested. That itself was sufficient.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**