Falls Garden Condominium Ass'n, Inc. v. Falls Homeowners Ass'n, Inc., No. 30, Sept. Term 2014, Opinion by Battaglia, J.

**CONTRACTS – FORMAL REQUISITES – LETTERS OF INTENT**

Letter of intent executed by parties was enforceable as a binding contract when the plain language of the letter demonstrated the parties intended to be bound and it expressed definite agreement on all material terms.

Circuit Court for Baltimore County,
Maryland
Case No. 03-C-10-013994
Argued: December 9, 2014

No. 30

September Term, 2014

FALLS GARDEN CONDOMINIUM
ASSOCIATION, INC.

v.

FALLS HOMEOWNERS
ASSOCIATION, INC.

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Battaglia, J.

Filed: January 27, 2015

"The way humans hunt for parking and the way animals hunt for food are

not as different as you might think."

Tom Vanderbilt, Traffic: Why We Drive the Way We Do 145 (2008).

Hunting and gathering spaces for parking a car not only consumes much of our personal time, but can also exacerbate tensions between neighboring communities, as in the present case. This appeal arises out of the execution of a letter of intent in settlement of litigation originating out of a contest over ownership of parking spaces situated between two entities, The Falls Homeowners Association (hereinafter "The Falls") and Falls Garden Condominium Association (hereinafter "Falls Garden"), both located in Baltimore County, Maryland.

At the end of 2010, Falls Garden, an association comprised of a cluster of condominiums located in the Summit Ridge area, filed a Complaint for Declaratory Judgment in the Circuit Court for Baltimore County asking for a determination that it was the owner of thirty-nine of sixty-seven parking spots that are located between its condominiums and the townhouses that are a part of The Falls, an association comprised of 112 townhomes. Falls Garden alleged that starting in 1985 and continuing through 2008, it believed that it held title to all sixty-seven parking spaces, but discovered in 2009 that it did not, in fact, own title to the spaces. It argued that, during the twenty-plus years, it obtained title to thirty-nine parking spaces through adverse possession as a result of its exclusive use and maintenance of those parking spaces, or in the alternative, that it obtained an easement by prescription or by necessity. Falls Garden asserted that, in 2010, The Falls began interposing ownership rights to all of the parking spaces by posting prohibitory

towing signs and painting curb markers.[1] The Falls answered the Complaint and denied Falls Garden's claims, as well as counterclaimed, alleging trespass.

As the trial date approached, the parties attempted to negotiate a settlement agreement. In a joint motion to continue the trial date, they requested a second settlement conference, stating that they had attended a settlement conference before Judge Edward P. Murphy and "made progress in the discussion but reached a point which exceeded the authority given to the corporate designee" of The Falls. As another trial date drew near, a second settlement conference was held, whereupon the parties filed another joint motion to continue the trial date, which included the following:

> 2. On August 15, 2011, the parties came to an agreement in principal regarding this dispute, however the parties need more to time [sic] memorialize the terms of the agreement which includes the preparation of a lease for a term of 99 years.
> 3. The parties believe that said agreement will be drafted and properly executed no later than 90 days from the date of this Motion. Once the agreement is properly executed the parties will file a Motion to Dismiss the Complaint and Counter-claim with prejudice.

In the following days, counsel for The Falls and Falls Garden exchanged emails, culminating in the parties executing a Letter of Intent. Problems arose, and The Falls filed a Motion to Enforce Settlement Agreement to implement the Letter of Intent. The Motion to Enforce professed that, in accordance with the Letter of Intent, The Falls successfully

---

[1] Interactions regarding the parking strip became quite heated. Falls Garden alleged that The Falls posted prohibitory signs indicating that the parking spaces were for its exclusive use and, after The Falls declined to remove the signs, Falls Garden removed the signs itself. Following the removal of the signs, according to Falls Garden's complaint, The Falls then painted curb markers to exhort its dominion over the spaces.

obtained the requisite votes of the members of its Association[2] and, thereafter, sent a proposed lease to Falls Garden's counsel by email for "review, comment and execution". Falls Garden did not respond to the email containing the proposed lease, according to the Motion, and, subsequently, disavowed the Letter of Intent by inquiring about "returning to pre-litigation status."[3] Falls Garden responded to the Motion, asserting that the Letter of Intent was not enforceable and that it objected to terms included in the proposed lease.

The Letter of Intent, in its entirety, recited:

> This Letter of Intent dated this 17th day of August, 2011, is meant to memorialize certain aspects of a formal Settlement Agreement and separate Lease to be entered into between Falls Garden Condominium, Inc. ("Falls Garden") and The Falls Homeowners Association, Inc. ("The Falls").
>
> The proposed Lease will contain the following provisions:
>
> 1. The term of the Lease will be 99 years, with The Falls as Lessor and Falls Garden as Lessee;
> 2. The property to be leased will be 24 parking spaces on the east side of Clearwind Court;
> 3. The 24 parking spaces will start at the island closest to Falls Garden Condominium Building #1 (6927-6933 Clearwind Court) on the northerly end of Clearwind Court and run continuously southerly toward Ten Timbers Lane;
> 4. The rent will be $20.00 per month per parking space;
> 5. The parking spaces shall be maintained, repaired and replaced by Falls Garden;

---

[2] According to The Falls's Motion to Enforce Settlement Agreement, as a Homeowners Association, under the terms of the Amendment to the Amended Declaration of Covenants, Conditions and Restrictions, at least two-thirds of the members must consent to leasing property owned by The Falls's Association for a term longer than one year. In the Motion, The Falls stated that it obtained approval of eighty-one of the 112 members of the Homeowners Association to lease the property.

[3] According to The Falls's Motion to Enforce Settlement Agreement, counsel representing Falls Garden, who replaced original counsel, sent the email rejecting the Letter of Intent.

6. Falls Garden shall be responsible for any real estate taxes assessed against the 24 parking spaces;

7. Falls Garden shall carry insurance in amounts reasonably requested by The Falls for liability and property damage;

8. Falls Garden shall indemnify The Falls with respect to any claims occurring on the 24 parking spaces;

9. The Lease shall contain the usual and customary provisions regarding dates and methods of payment, provisions for default and breach, severability, signs, quiet enjoyment, waiver, and the like.

The proposed Settlement Agreement will contain the following provisions:

1. The case filed by Falls Garden Condominium, Inc. against The Falls Homeowners Association, Inc., and the counterclaim filed by The Falls, in the Circuit Court for Baltimore County, Civil Case No. 03-C-10-013994, will be dismissed with prejudice;

2. Falls Garden will release The Falls from any claim of ownership of the 39 parking spaces on the east side of Clearwind Court running from Falls Garden Condominium Building #1 (6927-6933 Clearwind Court) southerly to Ten Timbers Lane;

3. On and after the date of the Lease and for the entire term of the Lease between the parties, Falls Garden may, but is not obligated to place signs on its property or on the 24 leased parking spaces indicating that they are exclusively for the use of the Unit Owners in Falls Garden and that Falls Garden shall have the right to tow any unauthorized vehicles from those parking spaces;

4. Neither party will take any action to disturb the status quo of head-in parking along Clearwind Court. However, if Baltimore County alters the current manner of head-in parking, the Lease will continue to encompass the land area that currently composes the 24 parking spaces that are the subject of the Lease.

5. The Falls shall prepare the Lease and submit the same to Falls Garden for review, comment and execution;

6. All costs attendant to the recording of the lease shall be paid by Falls Garden, in advance of recording among the Land Records of Baltimore County by The Falls;

7. The Settlement Agreement shall contain the usual and customary provisions found in settlement agreements regarding claims to property and the like.

This Letter of Intent and the undertakings of The Falls as to the Settlement Agreement and the Lease are contingent and conditioned upon

4

the Board of Directors of The Falls obtaining the affirmative vote of two thirds (2/3) of the members of the Homeowners Association to Lease the property described above.

Signed and dated the date first written above by the respective attorneys for Falls Garden Condominium, Inc. and The Falls Homeowners Association, Inc.

The Letter of Intent was signed by P. Michael Nagle, then counsel for Falls Garden, and

Michael H. Mannes, counsel for The Falls.

During the hearing on the Motion to Enforce the Settlement Agreement, new

counsel for Falls Garden argued that it had not intended to be bound by the Letter of Intent,

offering testimony to that effect:

The terms of the proposed lease are not acceptable to the condo and I would proffer, Your Honor, that I have people here who can testify if you need to hear. That their understanding was that they didn't have an agreement until these things were negotiated, signed and executed.

No testimony was taken, however. The Circuit Court Judge, after hearing the parties'

arguments as well as reviewing the email exchange, Letter of Intent and proposed lease,

made various findings, ultimately granting The Falls's Motion:

So, the Court finds that the parties had negotiated or attempted to negotiate a final resolution to this matter and the question then becomes whether or not the letter of intent constitutes a contract and, as both counsel knows, letters of intent can constitute a contract and in one of the cases that [counsel for Falls Garden] cited, there's actually a discussion concerning how letters of intent are generally looked at in four broad areas and they talk about various extremes and one extreme is the party may say specifically that they intend not to be bound until a formal writing is executed. There's, there's no specific language that this Court can find, either in the letter of intent or the negotiations back and forth to create the letter of intent, that that is specifically contemplated. At the other end of the extreme is the, the review of the letter of intent to determine whether the intent of the parties was to be bound by what was contained in the letter of intent that was ultimately simply, and I say simply, to be reduced to writing. Based on what this Court

5

has reviewed in terms of the negotiations, the letter of intent. The letter of intent could have been simply signed by both parties and constituted, in this Court's judgment, the agreement that the parties have reached. The Court finds, as a matter of law and fact, that the parties did enter into an agreement that was memorialized in the letter of intent, therefore, the request to enforce the agreement will be granted.

A written order was entered directing The Falls to prepare a settlement agreement and a release of all claims, consistent with the Letter of Intent, and instructing Falls Garden to execute the settlement agreement and proposed lease within five days of receipt. The Order also stated that the complaint and counter-complaint would be dismissed with prejudice within ten days after the execution of the lease and settlement agreement.

Falls Garden filed a Motion for Modification of Order Enforcing Settlement Agreement, stating that by complying with the Order, it could potentially waive its right to appeal, because of the language regarding release of claims in the documents. After The Falls opposed the Motion, the trial judge issued an Order affirming in part and denying in part the Order Enforcing the Settlement Agreement, declaring that the matter was ripe for interlocutory appeal and also that the matter was stayed pending the outcome of appeal.

Falls Garden noted an appeal, and the Court of Special Appeals affirmed in a reported opinion.[4] 215 Md. App. 115, 132, 79 A.3d 950, 960 (2013). In so doing, our

---

[4] Before the Court of Special Appeals, Falls Garden presented the following questions:
> 1. Whether the trial court erred by granting the HOA's Motion to Enforce Settlement Agreement.
> 2. Whether the trial court erred by failing to hold a full plenary hearing on the Motion to Enforce Settlement Agreement since the existence of a binding an[d] enforceable agreement was contested and there were contradicting proffers regarding a material issue in the case, *i.e.* whether the parties intended to be bound by the Letter of Intent.

(continued . . .)

intermediate appellate court determined that Falls Garden, in exchange for a leasehold interest in the parking spaces, agreed to discharge its claim against The Falls and that the Letter of Intent memorialized the agreement. *Id.* at 130, 79 A.3d at 958. The court also addressed Falls Garden's claim that the Circuit Court erred in failing to hold a full hearing on the merits and reasoned that Falls Garden did not request an evidentiary hearing, but at best, had merely proffered that Falls Garden could produce testimony to support its position. *Id.* at 132, 79 A.3d at 959. The Letter of Intent was unambiguous, the Court of Special Appeals reasoned, such that a reasonable observer would conclude the parties intended to be bound. *Id.* The court held, therefore, that "an evidentiary hearing was not necessary in this case because there was sufficient evidence to support [the Circuit Court's] decision." *Id.*

Falls Garden then filed a petition for a writ of certiorari, which we granted, 437 Md. 422, 86 A.3d 1274 (2014), to consider the following questions:

> 1. Whether it was error to enforce the Letter of Intent given the parties never intended to be bound by the Letter of Intent and the Letter of Intent does not contain all material terms.
> 2. Whether it was error to fail to hold a full plenary hearing on the Motion to Enforce Settlement Agreement since the existence of a binding an[d] enforceable agreement was contested and there were contradicting proffers regarding a material issue, *i.e.* whether the parties intended to be bound by the Letter of Intent.

---

(. . . continued)
The Falls cast the questions as follows:
> 1. Did the trial court properly conclude as a matter of law and fact that the parties entered into a binding and enforceable settlement agreement, which was memorialized in the Letter of Intent?
> 2. Did the trial court deny Falls Garden a plenary hearing?

7

We shall hold that the Letter of Intent is an enforceable contract to which the parties intended to be bound and shall order its enforcement. We also shall hold that, because the Letter of Intent is unambiguous and constitutes an enforceable contract, it was unnecessary to have a plenary[5] hearing on the merits of the Motion to Enforce Settlement Agreement.

We have had limited experience jurisprudentially with letters of intent; both parties before us rely primarily upon one of our only pertinent cases, *Cochran v. Norkunas*, 398 Md. 1, 919 A.2d 700 (2007). In *Cochran*, we determined that a letter of intent executed by the buyers and seller of real property was unenforceable, because the parties did not intend to be bound. We recognized, nonetheless, that a letter of intent can constitute a valid enforceable contract. We noted that the mere fact that a letter of intent explicitly contemplates future agreements does not make it unenforceable, because "some letters of intent are signed with the belief that they are letters of commitment and, assuming this belief is shared by the parties, the letter is a memorial of a contract." *Id.* at 13, 919 A.2d at 709, citing 1 Joseph M. Perillo, Corbin on Contracts § 1.16, p. 46 (Rev. ed. 1993).

The letter of intent in *Cochran* stated:

3/7/04

LETTER OF INTENT

We, Rebecca Cochran, Robert Cochran, Hope Grove and Robert Grove, Buyers—offer to buy 835 McHenry Street, Baltimore, Md. 21230 for $162,000. Payment by $5,000 check, this date and $157,000 by certified or cashiers funds not later than April 17, 2004.

---

[5] Black's Law Dictionary defines the word "plenary" as "[f]ull; complete; entire". Black's Law Dictionary 1313 (10th ed. 2014).

> A standard form Maryland Realtors contract will be delivered to Seller within 48 hours. Seller to pay only 1/2 normal transfer taxes and a 3% commission to Long & Foster. All other costs of closing to be paid by buyers.
>
> The contract will contain a financing requirement for buyers, but buyers will guarantee closing and not invoke the financing contingency.
>
> We will delete the standard home inspection contingency.
>
> [written in margin:] Buyer to honor seller's lease and offer tenants any renewal up to 12 months.

*Id.* at 6, 919 A.2d at 703-04. The letter of intent was executed by the parties and the $5,000 deposit was forwarded to the seller, although the check was not negotiated. After the seller received a package of documents, including a standard form Maryland Realtors contract, she began having second thoughts and removed the property from the market. Although the seller had signed various of the forms, she had not returned them nor indicated her acceptance to the buyers. The buyers filed suit seeking specific performance.

In *Cochran*, we acknowledged that when analyzing cases in which letters of intent have been in issue, the iconic Corbin had grouped those cases into four distinct categories:

> (1) At one extreme, the parties may say specifically that they intend not to be bound until the formal writing is executed, or one of the parties has announced to the other such an intention. (2) Next, there are cases in which they clearly point out one or more specific matters on which they must yet agree before negotiations are concluded. (3) There are many cases in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts. (4) At the opposite extreme are cases like those of the third class, with the addition that the parties expressly state that they intend their present expressions to be a binding agreement or contract; such an express statement should be conclusive on the question of their 'intention.'

*Id.* at 13, 919 A.2d at 707-08, quoting Corbin on Contracts, *supra*, § 2.9, p. 157-58. We recognized that "[a] valid contract generally has been made if a letter of intent properly falls within either the third or the fourth category." *Id.* at 14, 919 A.2d at 708, citing Corbin on Contracts, *supra*, § 2.9, p. 158.

In determining whether there was an enforceable contract, we began our analysis by discussing the essential prerequisite of mutual assent to the formation of a contract, which depends upon the parties' intent to be bound and the definiteness of terms in the letter of intent:

> It is universally accepted that a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract. *See Creel v. Lilly,* 354 Md. 77, 101, 729 A.2d 385, 398 (1999); *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 665, 150 A.2d 884, 888 (1959). Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms. *See* CORBIN ON CONTRACTS, *supra* at § 2.8, p. 131. Failure of parties to agree on an essential term of a contract may indicate that the mutual assent required to make a contract is lacking. *See Safeway Stores v. Altman,* 296 Md. 486, 489–90, 463 A.2d 829, 831 (1983); *Klein v. Weiss,* 284 Md. 36, 63, 395 A.2d 126, 141 (1978).

*Id.* at 14, 919 A.2d at 708. We recognized that, "[i]f the parties do not intend to be bound until a final agreement is executed, there is no contract." *Id.*

In our subsequent discussion in *Cochran*, we adopted and implemented the structure for evaluating intent to be bound suggested by Judge Pierre N. Leval, of the United States District Court for the Southern District of New York, in which he referred to the following:

> (1) the language of the preliminary agreement, (2) the existence of open terms, (3) whether partial performance has occurred, (4) the context of the negotiations, and (5) the custom of such transactions, such as whether a standard form contract is widely used in similar transactions.

*Id.* at 15, 919 A.2d at 708-09, citing *Teachers Ins. and Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 499-503 (S.D.N.Y.1987). We also alluded to additional considerations contained in Section 27, comment c, of the Restatement (Second) of Contracts including: "(1) whether the agreement has few or many details, (2) whether the amount involved is large or small, and (3) whether it is a common or unusual contract." *Id.* at 15, 919 A.2d at 709.

In discerning intent to be bound, according to the principle of the "objective" interpretation of contracts, we looked to "what a reasonably prudent person in the same position would have understood as to the meaning of the agreement." *Id.* at 17, 919 A.2d at 710.[6] We noted that, "[i]f the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation", such that, the search to determine the meaning of a contract is limited to the face of the document itself. *Id.* at 16-17, 919 A.2d at 709-10. We defined ambiguity as extant when, to a reasonable person, the language of the document "is susceptible to more than one meaning or is of doubtful meaning." *Id.* at 17,

---

[6] In *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985), which we cited in *Cochran*, we articulated the process of interpreting an agreement under the "objective" theory:

> A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

11

919 A.2d at 710. When determining intent, we noted that the "'customary, ordinary, and accepted meaning' of the language is used." *Id.*, quoting *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006).

In employing the objective theory, we perused the language of the letter of intent at issue and ultimately determined that the *Cochran* parties did not manifest the requisite intent to be bound. We opined that, "a reasonable person would have understood the letter of intent to mean that a formal contract offer was to follow the letter of intent", because three of the four paragraphs of the one-page letter directly referenced a forthcoming Maryland Realtors contract. *Id.* at 18, 919 A.2d at 710-11. We concluded, therefore, that the *Cochran* letter was unenforceable as a contract because it fell under Corbin's category two, "cases in which [the parties] clearly point out one or more specific matters on which they must yet agree before negotiations are concluded." Corbin on Contracts, *supra*, § 2.9, p. 157-58.

We begin here by looking at the express language of the Letter of Intent. Because the Letter of Intent does not, by its terms, state whether the parties intend to be bound, in accordance with Corbin's first and fourth categories, we turn to whether it fits into category two, "cases in which [the parties] clearly point out one or more specific matters on which they must yet agree before negotiations are concluded", or three, "cases in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts." *Id.*

The essential distinction between categories two and three manifests about whether the terms included in the document are definite or indefinite, which informs the central

question of whether there was an intent to be bound and, thus, mutual assent. *See Cochran*, 398 Md. at 14, 919 A.2d at 708. The "indefiniteness of terms bears upon the solution of both" intent to be bound and definiteness of terms, because "[d]efiniteness may show finality and the presence of an intention to be bound." Corbin on Contracts, *supra*, § 2.8, p. 131. Nonetheless, "[e]ven if an intention to be bound is manifested by both parties, too much indefiniteness [of terms] may invalidate the agreement, because of the difficulty of administering the agreement." *Id.*

The terms under scrutiny must be material terms, because "[a] contract, to be final, must extend to all the terms which the parties intend to introduce, and material terms cannot be left for future settlement." *Peoples Drug Stores, Inc. v. Fenton Realty Corp.*, 191 Md. 489, 494, 62 A.2d 273, 276 (1948). "Failure of parties to agree on an essential term of a contract may indicate that the mutual assent required to make a contract is lacking." *Cochran*, 398 Md. at 14, 919 A.2d at 708. Every possible term does not need to be included, however, because "[e]ven though certain matters are expressly left to be agreed upon in the future, they may not be regarded by the parties as essential to their present agreement." *See* Corbin on Contracts, *supra*, § 2.8, p. 138. As stated in Corbin on Contracts:

> It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called 'contract to make a contract' is not a contract at all.

*Id.* at § 2.8, p. 133-34. In essence, a letter of intent may be enforced if it is inclusive, on its face, of all definite material terms, utilizing the distinction between Corbin's categories two and three.

Here, the Circuit Court Judge and Court of Special Appeals both agreed that the Letter of Intent included all the material terms and that they were definite. The Circuit Court Judge found that the "letter of intent could have been simply signed by both parties and constituted, in this Court's judgment, the agreement that the parties have reached." The Court of Special Appeals concluded that the Circuit Court Judge "correctly found that the Letter of Intent contained all necessary terms of the parties' basic agreement to lease twenty-four specific parking spaces for a term of ninety-nine years at a rate of $20.00 per space per month." 215 Md. App. 115, 128, 79 A.3d 950, 957.

Falls Garden argues, however, that the Letter of Intent is not binding, because the parties did not intend to be bound and the Letter does not contain all material terms. Falls Garden contends that, at best, the Letter of Intent was merely a "framework" for the subsequent lease and settlement agreement and, by its very terms, operated only as "an intent to try to work with The Falls" to draft a lease and settlement agreement "that would contain all material terms." Falls Garden continues that the Letter of Intent only memorialized "certain aspects" of the lease and settlement agreement, the lease and settlement were "proposed", not final, and that the Letter of Intent noted that the lease was subject to "review" and "comment." It argues that the Letter of Intent did not include all the material terms, because the proposed lease agreement included terms that were not contemplated or agreed upon at the time the Letter of Intent was executed. Falls Garden

14

argues that the proposed lease included material terms such as the forfeiture of the entire lease upon occurrence of certain circumstances; a limitation of the liability of The Falls in the event it is a joint tortfeasor; Falls Garden's responsibility for taxes other than Real Estate taxes (i.e. the Stormwater Remediation Fee[7]); Falls Garden being responsible for maintaining insurance of not less than "$1 million combined single limit", with The Falls reserving a right to increase the insurance; and Falls Garden being responsible for "all necessary repairs and replacements" to the property. It also argues that the proposed lease is silent as to material terms such as provisions related to the responsibility of towing, which it claims it would have required to be a part of a final agreement. Falls Garden argues, additionally, that even if the Letter of Intent did contain all material terms, it would not be binding because it contemplated that the terms would be reduced to a final writing by way of the execution of a lease.

The Letter of Intent in issue is inclusive and definite as to all material terms. With regard to leasing the parking spaces, the terms were definite, as they include: the length of the lease, "99 years"; the number of parking spaces, "24"; the location, on Clearwind Court starting "at the island closest to Falls Garden Condominium Building #1 (6927-6933 Clearwind Court) on the northerly end of Clearwind Court and run[ning] continuously southerly toward Ten Timbers Lane;" and the price, "rent will be $20.00 per month per

---

[7] Falls Garden argues that, when the Letter of Intent was executed, it only agreed to pay real estate taxes and the proposed lease expanded its tax liability to "all taxes and assessments of every kind". Falls Garden argues that this would expand their liability to include fees such as the Stormwater Remediation Fee, commonly referred to as the "Rain Tax", which was enacted by the General Assembly as part of the Stormwater Management – Watershed Protection and Restoration Program.  2012 Md. Laws 941.

parking space". It professes that Falls Garden is responsible for maintenance and real estate taxes, and that Falls Garden must carry the burden of insurance "in amounts reasonably requested by The Falls for liability and property damage" and must indemnify The Falls for any claims "occurring on the 24 parking spaces". The Letter of Intent, additionally, declares that the lease will include that Falls Garden has the right to place signs on the property and to tow unauthorized vehicles, and asserts that if Baltimore County were to change the "current manner of head-in parking," then the lease would continue to include the area of land where the parking spaces are located. The only contingency, dependent upon action by The Falls, not Falls Garden, provides that the Letter and any future agreements "are contingent and conditioned upon the Board of Directors of The Falls obtaining the affirmative vote of two thirds (2/3) of the members of the Homeowners Association to Lease the property".

The provisions regarding settlement are also definite on their face; settlement included that "The case filed by Falls Garden Condominium, Inc. against The Falls Homeowners Association, Inc., and the counterclaim filed by The Falls, in the Circuit Court for Baltimore County, Civil Case No. 03-C-10-013994, will be dismissed with prejudice" and that "Falls Garden will release The Falls from any claim of ownership of the 39 parking spaces on the east side of Clearwind Court running from Falls Garden Condominium Building #1 (6927-6933 Clearwind Court) southerly to Ten Timbers Lane".

The only glitch appears to be in the Letter of Intent's inclusion of the provision that "The Falls shall prepare the Lease and submit the same to Falls Garden for review, comment and execution". Falls Garden argues that this addition of the lease language

16

compels the same result as *Cochran*, because like *Cochran*, the Letter of Intent "indicates clearly that the parties intended to finalize" their agreement through a future agreement. *See Cochran*, 398 Md. at 18, 919 A.2d at 711. We disagree.

Definite material terms of a lease were already included between the parties in the Letter of Intent, rendering the execution of a subsequent agreement unnecessary. Unlike *Cochran*, where the parties' lack of mutual assent could be discerned from the face of the letter of intent, because it was dependent on the execution of a standard form Maryland Realtors Contract, the explicit contemplation of future agreements, in the present Letter of Intent, does not render its terms indefinite.

The present Letter of Intent, thus, falls within Corbin's third category, which are those "cases in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts." Corbin on Contracts, *supra*, at § 2.9, p. 158. It is, therefore, enforceable on its face, without reliance on the Lease thereafter prepared by The Falls.[8] The lease sent for "review, comment and execution" was clearly, and in of itself, lacking in mutual assent and did not manifest the parties' intent to be bound to it. The lease, then, is not enforceable between the parties, only the Letter of Intent.

---

[8] This holding is limited to the Letter of Intent and not the enforcement of the proposed lease. Unlike the Circuit Court Judge and the Court of Special Appeals, we decline to enforce the proposed lease. The proposed lease was a draft that was not assented to by Falls Garden and, thus, not a binding contract. Specific performance is an "extraordinary" contract remedy that is only available to enforce a valid contract against one party. *See Barranco v. Kostens*, 189 Md. 94, 97, 54 A.2d 326, 328 (1947).

17

We now turn to the second question queued up by Falls Garden, in which it contends that the Circuit Court Judge erred in failing to hold a plenary hearing when Falls Garden proffered that it would produce testimony with respect to the issue of whether it intended to be bound by the Letter of Intent. Falls Garden contends that the Circuit Court Judge considered extrinsic evidence of emails and claims that the Circuit Court Judge was required "to either (1) make a finding on the record that such testimony was not a material fact concerning the existence of an agreement to settle or (2) conduct a full plenary hearing to evaluate the witnesses [sic] testimony and credibility regarding the issue." Falls Garden relies on one case from the Court of Special Appeals, *In re Damien F.*, 182 Md. App. 546, 958 A.2d 402 (2008), in which our intermediate appellate court, in a child in need of assistance case, determined that when a shelter care hearing is held pursuant to Section 3-815(c)(2)(i) of the Courts and Judicial Proceedings Article of the Maryland Code, testimony must be received as to the "material, disputed allegations", such that, "a denial of the request to produce witnesses, in that instance, is an abuse of discretion." *Id.* at 584, 958 A.2d at 424. *In Re Damien*, thus, is totally inapposite.

We have determined that the Letter of Intent included definite material terms, without ambiguity. As we stated in *Cochran*, "[i]f the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran*, 398 Md. at 16, 919 A.2d at 709. A trial judge need not entertain extrinsic evidence in the absence of ambiguous terms, especially evidence of a self-serving nature, as here, where

18

Falls Garden association members were offered to testify about their understanding of the Letter of Intent.

In summation, the Letter of Intent in issue between Falls Garden and The Falls is enforceable by its very terms, without our having to mandate enforcement of the lease submitted for "review, comment and execution".

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR ENTRY OF AN ORDER CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**