*4900 Park Heights Avenue LLC v. Cromwell Retail 1, LLC*, No. 3136, September Term, 2018.  Opinion by Fader, C.J.

**SETTLEMENT — AUTHORITY OF ATTORNEY — EXPRESS AUTHORITY**

When a client gives an attorney express authority to settle a case, that authority is not negated by the client's misunderstanding of the legal implications of a settlement term.

**SETTLEMENT — VALIDITY OF AGREEMENT — DEFINITENESS OF TERMS**

The circuit court properly enforced the terms of a settlement where the parties placed the material terms of the settlement on the record in open court, the terms were sufficiently definite to be enforceable, and the party challenging enforcement conceded that it intended to be bound by the terms placed on the record.

**SETTLEMENT — ORDERS ENFORCING SETTLEMENT — IMPROPER MODIFICATION**

In enforcing a settlement, a court is not permitted to alter the material terms upon which the parties agreed.

Circuit Court for Anne Arundel County
Case No. C-02-CV-16-003207

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3136

September Term, 2018

_____

4900 PARK HEIGHTS AVENUE LLC

v.

CROMWELL RETAIL 1, LLC

_____

Fader, C.J.,
Friedman,
Gould,

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: April 30, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

4900 Park Heights Avenue LLC ("4900 Park Heights"), the appellant, owns and operates The Sofa Store, which is located in a Glen Burnie business park developed by the appellee, Cromwell Retail 1, LLC ("Cromwell"). 4900 Park Heights initiated this litigation to resolve whether it had the right to erect on its premises, without Cromwell's approval, a 30-foot-tall, freestanding pylon sign to advertise its business. On the eve of trial, counsel informed the Circuit Court for Anne Arundel County that the parties had reached a settlement and would not go forward with the trial. The next morning, counsel for both parties appeared in court, confirmed that they had reached an agreement, and placed terms on the record. The central issue in this appeal is whether the terms placed on the record were binding on the parties. The circuit court determined that they were and, therefore, granted Cromwell's motion to enforce the settlement agreement. We agree and, as to that issue, will affirm the judgment. However, because the enforcement order impermissibly modified part of the settlement agreement, we also will vacate the judgment in part and remand for further proceedings consistent with this opinion.

## BACKGROUND

### *Lot Ownership and the Declaration of Covenants and Restrictions*

In January 2014, Cromwell transferred ownership of Lot 7R in Cromwell Business Park to 4900 Park Heights, subject to the terms of a 2014 Declaration of Covenants and Restrictions (the "2014 Declaration"). The 2014 Declaration contained a series of "perpetual and irrevocable" covenants that "run with the land within the Property." Central here are paragraphs 4 and 5 of the 2014 Declaration:

4. **Initial Improvements to Property**. [Cromwell] shall have the right, in its <u>sole and absolute discretion</u>, to approve or disapprove all aspects of the initial improvements constructed upon the Property and all material modifications to such improvements thereafter (collectively, the **"Initial Improvements"**). [Cromwell]'s right of approval includes, but is not limited to, all architectural design elements, exterior materials, colors and elevations, signage, and landscaping, and all future material revisions thereto.

5. **Future Improvements**. [Cromwell] shall have the right, in its <u>reasonable</u> discretion, to approve or disapprove all aspects of the improvements made to the Property after completion of the Initial Improvements (the **"Future Improvements"**). [Cromwell]'s right of approval includes, but is not limited to, all architectural design elements, exterior materials, colors and elevations, signage, and landscaping, and all future material revisions thereto. The standard of [Cromwell]'s approval shall be reasonable so long as the Future Improvements are consistent with the Initial Improvements. Notwithstanding the foregoing, in the event that any Future Improvements are materially different from the Initial Improvements, then the standard for [Cromwell]'s right to approve or disapprove the Future Improvements shall be in its <u>sole and absolute discretion</u>.

The Declaration also required that, "[b]efore commencement of construction of any improvements," the owner of the lot "shall submit plans and specifications" to Cromwell for approval.

*The Underlying Controversy*

In March 2015, 4900 Park Heights applied to the Anne Arundel County Department of Inspections and Permits for a permit to construct a freestanding, 30-foot tall, LED pylon sign on Lot 7R to advertise The Sofa Store. The County issued a permit in July 2015. In September 2016, without first seeking approval from Cromwell, 4900 Park Heights began construction.

Cromwell promptly sent 4900 Park Heights a cease and desist letter. Cromwell asserted that 4900 Park Heights was violating the 2014 Declaration by constructing the

2

sign without Cromwell's advance approval. The letter stated that if 4900 Park Heights did not cease all work on the sign, Cromwell reserved "the right to seek injunctive relief and recoupments of any costs or expenses incurred in enforcing the Declaration of Covenants and Restrictions."

4900 Park Heights beat Cromwell to the punch. In October 2016, 4900 Park Heights filed a complaint in the Circuit Court for Anne Arundel County, asking the court to declare that Cromwell had unreasonably withheld its approval of the sign and, therefore, that construction of the sign could proceed.[1] In February 2017, with the litigation still pending, 4900 Park Heights finished construction of the sign. The following month, Cromwell filed a counterclaim in which it sought, among other things, declaratory and injunctive relief against 4900 Park Heights.

### The March 28, 2018 Hearing

The parties' opposing claims were scheduled to proceed to trial on March 28, 2018. The evening before that, however, counsel for the parties reached what they both believed to be a settlement. That night, Cromwell's counsel sent an e-mail to the court, copied to counsel for 4900 Park Heights, which stated in pertinent part: "Counsel will appear Wednesday to place on the record their agreement which settles this case as well as another case pending before the Court."[2]

---

[1] The original complaint named 4900 Park Heights's predecessor in interest as the plaintiff. 4900 Park Heights substituted itself as the proper plaintiff in an amended complaint filed in January 2017.

[2] In addition to the declaratory judgment action, 4900 Park Heights had also filed a separate petition for judicial review of a decision by the Anne Arundel County Office of

The following day, counsel for both parties—Thomas M. Wood, IV, for 4900 Park Heights, and Jonathan P. Kagan, for Cromwell—appeared before the circuit court. After a preliminary discussion, the court noted that it was "happy that the parties have reached an agreement" and asked, "[W]hich side would like to memorialize the terms of the agreement?" The following discussion ensued:

> MR. WOOD[]: I think we have sort of roughly done it. I think [Cromwell's counsel] is just going to come up here and put it on the record. This is going to be followed by a settlement agreement.
>
> THE COURT: Great. Okay.
>
> MR. KAGAN: Yes. So, I can just generally put the terms, if I may, on the record.
>
> . . .
>
> Your Honor, just again to memorialize the general terms which will be reduced to a settlement agreement, first, that the parties agree that [4900 Park Heights]'s freestanding pylon sign, that is, the Sofa Store sign, shall remain in its present location, except that the top of the sign shall be lowered 12 feet, . . . provided that if [Cromwell], in its sole absolute discretion, determines that [Cromwell]'s pylon sign is not impeded, that it may only be lowered 11 feet.
>
> So, there will be some discretion between 11 feet and 12 feet, depending on whether there is any obstruction.
>
> THE COURT: Okay.
>
> MR. KAGAN: [4900 Park Heights] and [Cromwell] shall each pay their own legal fees. [4900 Park Heights] shall pay court costs.
>
> The parties agree to modify the [2014 Declaration] . . . so that all initial and future improvements, as defined therein, must be approved by

Planning and Zoning granting Cromwell a nonconforming use exception for Cromwell's own freestanding sign. In that litigation, Cromwell alleged that its own pylon sign was obscured by 4900 Park Heights's sign.

Cromwell Retail 1, LLC, which shall be in the sole and absolute discretion of Cromwell Retail 1, LLC.

THE COURT: Now, is that only amended vis-à-vis 4900 [Park Heights]? Or are there other present owners that would be incorporated within that?

MR. KAGAN: So, it just applies to the particular lot that the Sofa Store is on.

THE COURT: Okay.

MR. KAGAN: And the declarant in that declaration is Cromwell Retail 1, LLC, but it applies specifically to the lot of the Sofa Store, or the Plaintiff in this case.

. . . The parties in this case will dismiss all claims and counterclaims without prejudice . . . until the sign has been relocated.

I believe the parties agreed that [4900 Park Heights] would try to accomplish that within 45 days of today and that, again, upon completion of that, that the parties would agree that both lawsuits, that is this current lawsuit, as well as the petition for judicial review, would then be dismissed with prejudice.

THE COURT: Okay.

MR. WOOD[]: And assuming also that we can agree on the language of the covenants and we can agree on the mutual release.

MR. KAGAN: Right.

THE COURT: So, you are asking the Court to hold not everything in abeyance? Just dismiss it without prejudice and then file a line in 45 days, assuming everything -- is that right?

MR. KAGAN: Right. Essentially, following the completion of the lowering of the sign, as well as the other terms of the settlement agreement; that once all the terms of the settlement agreement have been met, that the parties will then agree to file lines of dismissal with prejudice for both matters.

THE COURT: I see.

MR. KAGAN: Also, lastly, that the parties will agree to a mutual general release as well.

5

THE COURT: Okay. Any modifications, additions, deletions, Mr. Wood?

MR. WOOD[]: No, Your Honor.

THE COURT: All right. Well, that sounds very reasonable. Mr. Kagan, are you putting together the settlement agreement?

MR. KAGAN: Yes.

THE COURT: Okay.

The court expressed a preference that the parties "resolve any wordsmithing issues" with the agreement, and sign the final draft, before forwarding it to the court. Before dismissing the parties, the court reiterated that it was "pleased you reached a settlement."

### *Cromwell's Motion to Enforce*

On May 4, 2018, counsel for Cromwell wrote to the court to request that the court grant the parties "an additional 10 days, until May 14, 2018, to finalize and execute the settlement documents and file a Stipulation of Dismissal with the Court." The letter, which was copied to counsel for 4900 Park Heights, stated that "[w]hile the material terms of the settlement were agreed to on the record, the parties are still in the process of working out the terms of the Settlement Agreement and Release, and Restated Declaration of Covenants and Restrictions that will need to be filed with Land Records." The letter also stated that the parties had exchanged drafts of the settlement agreement, but that changes received from 4900 Park Heights the previous day were "substantive and the parties need additional time to try to resolve all issues before having to file any motions to enforce the Settlement Agreement or request the matter be reset for trial."

6

On May 15, 2018, Cromwell filed a motion to enforce the settlement as set forth on the record at the March 28 hearing and as memorialized in a draft settlement agreement and draft amendment to the 2014 Declaration that Cromwell had composed. 4900 Park Heights opposed the motion.

The court held a hearing in October 2018 before a different judge. The court addressed two issues. First, the court considered whether the parties had entered a binding settlement agreement during the March 28 hearing. On that issue, the court declined to take evidence. Instead, the court took judicial notice of the transcript of the March 28 hearing and, based on the transcript, found "that each of the parties clearly intended to be bound by th[e] terms" placed on the record. The court also concluded "that the terms of the agreement are definite and the language put on the record was clear, unambiguous and there were no open material terms to the agreement."

The court declined to admit into evidence documents submitted by 4900 Park Heights that reflected the parties' communications after March 28. 4900 Park Heights argued that the documents revealed that the parties disagreed regarding two terms of the settlement, the proposed amended declaration and the mutual general release. Notably, however, 4900 Park Heights never argued that the parties had not intended to be bound by the terms placed on the record on March 28. Indeed, Mr. Wood conceded that they had. Instead, 4900 Park Heights asserted that the settlement documents Cromwell had drafted did not *reflect* the agreement the parties had reached. The following passages capture the essence of that argument:

7

THE COURT: . . . I believe everybody in the courtroom thought you had an agreement otherwise you would have proceeded to trial.

MR. WOOD: Yes, Your Honor.

THE COURT: The 45 days was to implement the terms of the agreement as I read this.

MR. WOOD: That is true, Your Honor, but the agreement was not implemented because – certainly we went into that courtroom to put on the record that we had settled the case but the amended covenant was, as I just said earlier, was changed in many substantial ways.

THE COURT: But that is different. That –

MR. WOOD: But the release, also the release, which was an essential term. The release. We never got the release, and to this day we don't have the release. It was a mutual, general release, and we weren't given a mutual general release. There are some –

THE COURT: But what you are talking about is enforcement of the agreement, not whether there was an agreement.

MR. WOOD: There was a general agreement to settle, yes. I am not disputing that.

THE COURT: Okay.

MR. WOOD: But was it to be embodied in two documents, which were going to contain essential terms. A general release, for instance. And we never got those terms. Sitting here today, we still don't have a general release.

. . .

THE COURT: Okay, but again we are talking about enforcement issues not whether there was an agreement. Do you concede that there was an agreement to settle the – agreement on the terms, which settled the case, on March 28, 2018?

MR. WOOD: There was an agreement to agree to settle the case.

THE COURT: I don't think there was an agreement to agree. I don't think the Court would have pulled the hearing if there was an agreement to agree.

. . .

MR. WOOD: So the question is did we intend to be bound? Yes, we intended to be bound[] but the question is what did we intend to be bound to, and that had to be embodied in those two documents. The amended declaration and the mutual release.

. . .

[*Falls Garden Condominium Association v. Falls Homeowners Association*, 441 Md. 290 (2015)] says even if an intention to be bound is manifested by both parties, too much indefiniteness may invalidate the agreement because of the difficulty of administering the agreement.

I submit that there was this indefiniteness. Look what we got. We got an amended declaration that was changed in five or six different ways. We got a release that didn't give us a general release.

Based on its conclusion that the terms placed on the record were clear and unambiguous, the court determined that "what happened after the parties reached their agreement and placed it on the record is not of significance." Otherwise, the court reasoned, "anybody could enter into any kind of agreement on the record and then simply try to change the terms or argue about the terms that they placed on the record afterward and invalidate the agreement."

The second issue the court addressed at the October 2018 hearing was 4900 Park Heights's contention that its counsel, Mr. Wood, did not have his client's express authority to agree to the terms put on the record on March 28. On that issue, the court heard evidence, which included testimony from counsel for both parties who were involved in the negotiations leading up to March 28: Mr. Wood, for 4900 Park Heights, and Harry Blumenthal, for Cromwell.

9

According to the testimony, Messrs. Wood and Blumenthal were engaged in settlement negotiations by telephone throughout the day on March 27, and Mr. Wood communicated with his client representative, Cary Luskin, throughout those negotiations. At one point during a phone call in which both counsel and clients participated, Cromwell demanded that 4900 Park Heights pay Cromwell's legal fees as part of any settlement. 4900 Park Heights refused, and the call ended. Mr. Blumenthal later called Mr. Wood with a new offer: Cromwell would drop its request for fees if 4900 Park Heights would agree that Cromwell would have "sole and absolute discretion on all matters dealing with the covenants." Originally assuming that this term concerned only signage at the property, and not other improvements, Mr. Wood obtained Mr. Luskin's agreement. When Mr. Blumenthal clarified that Cromwell wanted sole and absolute discretion with respect to all improvements, not just signage, Mr. Wood indicated he needed to check again with Mr. Luskin. When he did so, Mr. Luskin said, "I don't care about the covenants." Mr. Wood testified that he understood Mr. Luskin's response to mean that his client consented to the amendment. He therefore called Mr. Blumenthal back and communicated that agreement. On that basis, the parties informed the court of the settlement and placed its terms on the record on the morning of March 28.

Later that same day, Mr. Wood learned that Mr. Luskin had a different interpretation of his comment about the covenants. Specifically, according to Mr. Wood, Mr. Luskin had intended to convey that he did not care about giving Cromwell sole and absolute discretion to approve any future improvements proposed by 4900 Park Heights, but that he had not

10

understood that the change would bind its successors. Mr. Luskin "was concerned that he would not have the ability to sell the property with those restrictions."

Mr. Wood did not inform the court or Cromwell of that alleged misunderstanding until months later, after the parties had already exchanged multiple drafts of the settlement documents. Mr. Wood acknowledged that the terms stated on the record during the March 28 hearing were consistent with his own understanding of the authority he had received from Mr. Luskin on that date.

Based on the evidence presented, the court found that "Mr. Wood had express authority to bind his client" and, accordingly, granted Cromwell's motion to enforce the terms of the settlement. The court asked the parties to work together to submit appropriate paperwork to implement its ruling. When the parties, unable to reach agreement, submitted dueling proposals, the court entered an order that adopted the proposed order and the mutual general release submitted by 4900 Park Heights and the amendment to the 2014 Declaration submitted by Cromwell. 4900 Park Heights filed a motion to alter or amend, which the court denied. 4900 Park Heights then filed this timely appeal.

## DISCUSSION

4900 Park Heights argues that the court erred in enforcing the settlement agreement because (1) Mr. Wood did not have express authority to bind 4900 Park Heights; (2) the general terms placed on the record at the March hearing did not constitute a valid, binding agreement; and (3) even assuming a valid agreement existed, the court's order adopting

11

Cromwell's version of the amendments to the 2014 Declaration impermissibly modified the terms to which the parties had agreed.

"In reviewing [a ruling on] a motion to enforce a settlement agreement, we review the circuit court's factual findings for clear error and its legal conclusions *de novo*." *Na v. Gillespie*, 234 Md. App. 742, 749 (2017). "A trial court's factual findings are not clearly erroneous as long as they are supported by any competent material evidence in the record." *Saxon Mortg. Servs. v. Harrison*, 186 Md. App. 228, 262 (2009) (citing *Figgins v. Cochrane*, 403 Md. 392, 409 (2008)). Although a trial court's entry of an order reflecting a settlement is subject to an abuse of discretion standard, a court abuses its discretion if it enters an order containing terms that vary from, or otherwise fail to reflect, those to which the parties have agreed. *See Smith v. Luber*, 165 Md. App. 458, 467, 479 (2005); *cf. Long v. State*, 371 Md. 72, 89 (2002) (holding that court improperly entered a modified consent order that "materially altered the agreement reached by the parties").

An "attorney's authority to settle claims is a question of fact." *Scamardella v. Illiano*, 126 Md. App. 76, 84 (1999). "Whether or not there was an agreement of settlement, and if so, what were its terms[,] are, upon conflicting evidence, questions for the trier of fact" as well. *Grain Dealers Mut. Ins. v. Van Buskirk*, 241 Md. 58, 70 (1965); *see also Eisenberg v. Air Conditioning, Inc.*, 225 Md. 324, 331-32 (1961) (in dispute over contract's compensation term, where "there was conflict in the testimony as to whether any such compensation was ever agreed upon, . . . [i]t was [] a function of the trial court to evaluate the evidence"). However, "if the facts and permissible inferences are undisputed,

12

. . . a court will rule on the point as a matter of law." *Barnes v. Euster*, 240 Md. 603, 608 (1965).

"Settlement agreements are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts." *Erie Ins. Exch. v. Estate of Reeside*, 200 Md. App. 453, 460 (2011) (quoting *Maslow v. Vanguri*, 168 Md. App. 298, 316 (2006)). "The interpretation of a contract, including the determination of whether the language of a contract is ambiguous, is a question of law, subject to *de novo* review by an appellate court." *Erie*, 200 Md. App. at 461 (quoting *Maslow*, 168 Md. App. at 317). We interpret contracts under "the objective theory of contract interpretation." *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019). "Under this approach, the primary goal of contract interpretation is to ascertain the intent of the parties in entering the agreement and to interpret 'the contract in a manner consistent with that intent.'" *Id.* (brackets omitted) (quoting *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 88 (2010)). Accordingly, "unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation." *Ocean Petroleum*, 416 Md. at 86. That is, where the language is unambiguous, "we consider the contract from the perspective of a reasonable person standing in the parties' shoes at the time of the contract's formation." *Id.*

**I.** **THE CIRCUIT COURT DID NOT CLEARLY ERR IN FINDING THAT MR. WOOD HAD EXPRESS AUTHORITY TO SETTLE ON BEHALF OF 4900 PARK HEIGHTS.**

4900 Park Heights contends that the circuit court erred when it found that "Mr. Wood had express authority to bind his client" on March 28, 2018. In making that finding, the court observed that: (1) Mr. Wood "was in conversations with his client throughout the negotiations"; (2) he "communicated . . . back and forth with his client" throughout the discussions; and (3) "any reasonable person" would have understood Mr. Luskin's comment, "I don't care about the covenants," to mean that Mr. Wood "had the authority to agree to the proposal on the covenants." Moreover, the court noted, no client representative of 4900 Park Heights appeared in court on March 28, which further suggested "that Mr. Wood had that party's authority to act on their behalf on that day."

At the outset, we emphasize that 4900 Park Heights does not argue that Mr. Wood lacked express authority to agree to *a* settlement on March 28. Indeed, 4900 Park Heights concedes that Mr. Luskin, its duly-authorized client representative, and Mr. Wood both understood (1) that Mr. Luskin had expressly authorized Mr. Wood to settle the case, and (2) that the authorization extended to an amendment to the 2014 Declaration that would give Cromwell sole and absolute discretion to approve future improvements to Lot 7R. Instead, 4900 Park Heights premises its argument on Mr. Wood's alleged misunderstanding of what Mr. Luskin intended when he told Mr. Wood that he "d[id]n't care about the covenants." According to 4900 Park Heights, while Mr. Wood understood

14

that any such alteration would bind the successors of 4900 Park Heights, Mr. Luskin did not.

"The relationship of lawyer to client is generally one of agency." *In re Alijah Q.*, 195 Md. App. 491, 520 (2010) (citing *Salisbury Beauty Sch. v. State Bd. of Cosmetologists*, 268 Md. 32, 45 (1973)). "The actions of an attorney within the scope of his employment are binding upon his client under the ordinary principles of agency." *Salisbury Beauty Sch.*, 268 Md. at 45. "There is a *prima facie* presumption in Maryland 'that an attorney has authority to bind his client by his actions relating to the conduct of litigation.'" *Mitchell Props. v. Real Estate Title Co.*, 62 Md. App. 473, 483 (1985) (quoting *Kinkaid v. Cessna*, 49 Md. App. 18, 22 (1981)).

An attorney's implied authority does not, however, extend to settlement. "[A]n attorney by virtue of the attorney-client relationship does not have implied authority to settle his client's claim. There must exist express authority to the attorney to authorize him to settle the client's case." *Accrocco v. Splawn*, 264 Md. 527, 533 (1972); *see also Kinkaid*, 49 Md. App. at 22 ("[A]n attorney has no implied authority to compromise his client's claim. Express authority is required." (internal citations omitted)). It is the burden of "the party seeking to enforce a settlement order [to] prove: (1) that the other party's counsel acted with the authority of his client; and (2) that such authority expressly extended to the settlement of the claim." *Mitchell Props.*, 62 Md. App. at 483.

At the hearing, the court heard testimony from Mr. Wood that: (1) he was in communication with his client throughout the settlement negotiations; (2) he informed his

15

client that, in exchange for dropping its demand for attorney's fees, Cromwell requested that 4900 Park Heights agree to amend the 2014 Declaration to provide Cromwell with sole and absolute discretion to approve all future improvements; (3) in response, Mr. Luskin told Mr. Wood that he "d[id]n't care about the covenants" and authorized him to settle the case; (4) Mr. Wood conveyed to Mr. Blumenthal that the parties had an agreement on that term; and (5) the parties placed on the record the terms of the agreement Mr. Wood understood his client to have authorized.[3] This constituted "ample evidence to support" the court's finding of express authority. *See Carroccio v. Thorpe*, 230 Md. 457, 463 (1963); *see also Posko v. Climatic Control Corp.*, 198 Md. 578, 583 (1951) ("[E]xpress authority may be shown through the testimony of the agent.").

Although 4900 Park Heights characterizes the disconnect between Mr. Luskin and Mr. Wood as a misunderstanding regarding the terms Mr. Luskin had authorized, it is more accurately characterized as a misunderstanding regarding the legal effect of a change to the 2014 Declaration. There is no genuine dispute regarding whether Mr. Luskin authorized a change to the covenant. By Mr. Wood's account, Mr. Luskin could hardly have been clearer in informing Mr. Wood that he "d[id]n't care about the covenants" and, therefore, was amenable to the requested amendment. Mr. Luskin might not have understood fully

---

[3] We also think it noteworthy that although Messrs. Wood and Luskin apparently became aware of the misunderstanding on the same day the settlement was placed on the record, they did not assert a lack of authority at that time, nor did they promptly inform the court or Cromwell of the disconnect. Instead, for months afterward, they purported to engage in the exercise of finalizing the paperwork for the settlement that had been placed on the record.

16

that the amendment would bind any future owners of Lot 7R in addition to him, but that does not detract from his agreement to it.[4]

Moreover, even if there were any ambiguity in what Mr. Luskin authorized—as opposed to whether Mr. Luskin understood fully the implications of what he authorized—we would not deem clearly erroneous the circuit court's finding that Mr. Wood reasonably interpreted Mr. Luskin's statement and, therefore, had authority to act in accord with it. *See, e.g.*, *Dickerson v. Longoria*, 414 Md. 419, 442 (2010) ("Actual 'authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" (quoting *Citizens Bank of Md. v. Md. Indus. Finishing Co.*, 338 Md. 448, 459 (1995))); *accord Harris v. Ray Johnson Constr. Co.*, 534 S.E.2d 653, 654-55 (N.C. Ct. App. 2000) (holding that an attorney who "reasonably believed at the time of negotiation that he could settle the case for [a *gross* sum of] $2000 . . . possessed actual authority to settle in that amount," notwithstanding that his client had "intended to *net* $2000 from the settlement" after legal fees and medical expenses (emphasis added));

---

[4] By its unambiguous terms, the 2014 Declaration applies not only to the current owner of Lot 7R, but to all successors in interest. Indeed, that is a key feature of a recorded declaration containing covenants that run with the land. *See County Comm'rs v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 448-49 (2001); *cf.* 21 C.J.S. *Covenants* § 38 (2020) ("Restrictions running with the land are intended to limit the grantee's use of the land to specified purposes, with the object of protecting the interests of all landowners in the same allotment."). Whether Mr. Luskin understood the legal implications of what he was agreeing to was (and remains) between him and his counsel. Neither the court nor the opposing party is charged with divining a represented party's subjective understanding of unambiguous contractual terms.

*cf.* Restatement (Third) of Agency § 2.02(2) (2006) ("An agent's interpretation of the principal's manifestations is reasonable if it reflects any meaning known by the agent to be ascribed by the principal and, in the absence of any meaning known to the agent, as a reasonable person in the agent's position would interpret the manifestations in light of the context, including circumstances of which the agent has notice and the agent's fiduciary duty to the principal.").

Although 4900 Park Heights asserts that a client's express authorization to settle a case will be negated by a misunderstanding between attorney and client regarding a particular term of the settlement agreement, the cases it cites do not support that contention. 4900 Park Heights relies most heavily on *Kinkaid v. Cessna*, 49 Md. App. 18 (1981), which it contends "is controlling" and presents "precisely the same situation [as] the instant case." In *Kinkaid*, before trial in a negligence case, the plaintiff's counsel spoke with his client's wife about a settlement proposal the attorney had received. *Id.* at 20. As plaintiff's counsel later recalled, his client's wife told the attorney that her husband was "upset, but he believes that he ought to go on with it." *Id.* The attorney thought that meant his client wanted to "go forward and settle the claim," and he so informed the other side and the court. *Id.* He later learned, however, that his client actually wanted to "go on with" the trial. *Id.* Notably, plaintiff's counsel provided this account during his argument on the defendants' motion to enforce the settlement, not under oath. *Id.* Nonetheless, on the basis of those representations, the trial court concluded that the plaintiff's attorney had not received

18

express authority to agree to the settlement and, therefore, denied the motion to enforce. *Id.* at 21.

This Court did not reach the merits. Instead, we held that the defendants "did not sustain their burden of proof" as to "the express authority of [plaintiff]'s counsel to settle the lawsuit" because they "presented no evidence." *Id.* at 23. We did, however, address the defendants' alternative argument that plaintiff's attorney had acted reasonably in interpreting ambiguous instructions from his client.[5] *Id.* On that point, we observed that before agreeing to the settlement, the attorney had not received *any* instruction from his client, but only from his client's spouse, "who was neither a party to this suit nor an agent of the husband." *Id.* at 24. We therefore affirmed the circuit court's decision not to enforce the settlement, although on different grounds.

*Kinkaid* is inapposite here for three independent reasons. First, because of the defendants' complete failure of proof in *Kinkaid*, we never addressed the merits of whether the attorney had express authority to settle. The case thus does not speak to that issue. Second, the alleged misunderstanding in *Kinkaid* was over whether the client intended to authorize settlement at all. Here, by contrast, it is undisputed that Mr. Luskin intended to

---

[5] This alternative argument was based on Restatement (Second) of Agency § 44 (1958), which provides:

> If an authorization is ambiguous because of facts of which the agent has no notice, he has authority to act in accordance with what he reasonably believes to be the intent of the principal although this is contrary to the principal's intent; if the agent should realize its ambiguity, his authority, except in the case of an emergency, is only to act in accordance with the principal's intent. If an authorization is not ambiguous, the agent is authorized to act only in accordance with its reasonable interpretation.

authorize a settlement; the dispute concerns only his understanding of one of the terms he authorized. Third, whereas the purported authorization in *Kinkaid* came from a third person, Mr. Luskin was 4900 Park Heights's authorized representative.

4900 Park Heights also claims support from *King v. Bankerd*, 303 Md. 98 (1985), which is equally unhelpful to its argument. There, a principal had executed a power of attorney in favor of an agent, which authorized the agent to sell certain property "on such terms as to him may seem best." *Id.* at 102. After the agent conveyed the property for no consideration to the principal's estranged spouse, the principal sued the agent for breach of fiduciary duty. *Id.* at 103-04. The Court of Appeals held that "an agent holding a broad power of attorney lacks the power to make a gift of the principal's property" absent (1) express authority, (2) "necessary implication from the conferred powers," or (3) proof that the parties "clearly [so] intended." *Id.* at 107. Finding that none of those circumstances existed—and, indeed, that the evidence demonstrated clearly that the principal did not intend to authorize a conveyance for no consideration—the Court affirmed the judgment and award of damages against the agent. *Id.* at 112-14.

*King* has no application here. The issue in *King* was the liability of the agent to the principal for having acted outside of his express authority. Nothing in *King* suggests that the underlying transaction could have been unwound—as 4900 Park Heights advocates here—due to the agent's lack of express authority. Moreover, *King* was fundamentally about the proper interpretation of broad language in a power of attorney, *id.* at 101, which is not at issue here. And the evidence in *King* "clearly belie[d] an assertion that [the

20

principal] authorized any gift of the property." *Id.* at 113. In this case, conversely, the evidence was that Mr. Luskin *did* provide express authority to settle and that Mr. Wood's understanding of his specific instructions was reasonable.

Finally, we note the troubling implications of the rule 4900 Park Heights would have us adopt, which would seem to render suspect any settlement concluded by counsel— and conveyed to the court—unless and until their clients confirmed independently not only that they had authorized a settlement, but also that they and their attorneys shared the same subjective understanding of the agreed terms. Such a rule would impede settlements and the efficient operation of the courts, *see Maslow*, 168 Md. App. at 317 ("[C]ourts should 'look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony.'" (quoting *Clark v. Elza*, 286 Md. 208, 219 (1979))); permit much mischief by parties inclined to back out of agreed settlements (either by design or as a result of buyer's remorse), *see, e.g.*, *Chernick v. Chernick*, 327 Md. 470, 481-83 (1992) (declining to permit party to renege on divorce consent judgment that had been agreed upon by the parties); and thereby subvert the State's deeply rooted public policy encouraging settlements, *see, e.g.*, *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 447 Md. 394, 420 (2016) ("The law always favors compromises and amicable adjustments of disputes." (quoting *Sisson v. Mayor & City Council of Baltimore*, 51 Md. 83, 95-96 (1879))); *Smith*, 165 Md. App. at 468-69 (stating that "the public policy encouraging settlements is so strong that settlement agreements will not be disturbed on the grounds of mistake or withdrawal of consent by a

21

party"); *Nationwide Mut. Ins. v. Voland*, 103 Md. App. 225, 237 (1995) ("The policy of encouraging settlement is so important that, even when the parties later discover that the settlement may have been based on a mistake, settlement agreements will not be disturbed."); *see also David v. Warwell*, 86 Md. App. 306, 310-12 (1991) (recounting history of policy favoring settlement in Maryland law).

In sum, we conclude that the circuit court did not clearly err in finding that Mr. Wood had his client's express authority to agree to the settlement that was placed on the record during the March 28 hearing.

## II. THE CIRCUIT COURT DID NOT ERR IN ENFORCING THE TERMS OF THE SETTLEMENT PLACED ON THE RECORD AT THE MARCH 28 HEARING.

4900 Park Heights next asserts that the circuit court erred in determining that the settlement terms placed on the record on March 28 constituted a binding contract. 4900 Park Heights argues that the basic requirements to form a contract were not met, because (1) there was no manifestation of the parties' intent to be bound absent their subsequent consent to the terms of a contemplated written settlement agreement and (2) certain terms were too indefinite to be enforced. We conclude that 4900 Park Heights conceded before the circuit court that it did intend to be bound by the settlement and that the terms identified were not too indefinite to be enforced. Accordingly, we find no error in the circuit court's decision to enforce the settlement.

When parties agree on terms to resolve a dispute, but contemplate that those terms will eventually be incorporated into a final written agreement, whether the preliminary

22

agreement is itself binding depends on which of the following categories best characterizes the preliminary agreement:

> (1) At one extreme, the parties may say specifically that they intend not to be bound until the formal writing is executed, or one of the parties has announced to the other such an intention.
>
> (2) Next, there are cases in which they clearly point out one or more specific matters on which they must yet agree before negotiations are concluded.
>
> (3) There are many cases in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts.
>
> (4) At the opposite extreme are cases like those of the third class, with the addition that the parties expressly state that they intend their present expressions to be a binding agreement or contract; such an express statement should be conclusive on the question of their "intention."

*Cochran v. Norkunas*, 398 Md. 1, 13 (2007) (breaks added) (quoting 1 Joseph M. Perillo, *Corbin on Contracts* § 2.9, at 157-58 (rev. ed. 1993)). When a preliminary agreement falls into the first or second categories, it is not enforceable unless and until the parties finalize the terms in a formal written agreement. *See Cochran*, 398 Md. at 14. Conversely, "[a] valid contract generally has been made if a [preliminary agreement] properly falls within either the third or the fourth category." *Id.* (citing *Corbin on Contracts* § 2.9, at 158).

"'[A]n essential prerequisite to the creation or formation of a contract' is 'a manifestation of mutual assent.'" *Advance Telecom Process v. DSFederal, Inc.*, 224 Md. App. 164, 177 (2015) (quoting *Cochran*, 398 Md. at 14); *see also Mitchell v. AARP Life Ins. Program, N.Y. Life Ins.*, 140 Md. App. 102, 116 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the

23

parties must be in agreement as to its terms.'" (quoting *Safeway Stores v. Altman*, 296 Md. 486, 489 (1983))). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Advance Telecom*, 224 Md. App. at 177 (quoting *Cochran*, 398 Md. at 14). "If the parties do not intend to be bound until a final agreement is executed, there is no contract." *Cochran*, 398 Md. at 14.

### A. The Court Did Not Err in Concluding that the Parties Intended to Be Bound Because 4900 Park Heights Conceded that It Did.

When evaluating intent to be bound, we consider the following factors: "(1) the language of the preliminary agreement, (2) the existence of open terms, (3) whether partial performance has occurred, (4) the context of the negotiations, and (5) the custom of such transactions." *Falls Garden Condo. Ass'n v. Falls Homeowners Ass'n*, 441 Md. 290, 302 (2015) (quoting *Cochran*, 398 Md. at 15). The language of the preliminary agreement is "[t]he primary source for determining the intention of the parties." *Advance Telecom*, 224 Md. App. at 177 (quoting *8621 Ltd. P'ship v. LDG, Inc.*, 169 Md. App. 214, 226 (2006)).

In examining the contractual language for indicia of intent to be bound, we employ our familiar contract interpretation toolkit. *Cochran*, 398 Md. at 16; *Advance Telecom*, 224 Md. App. at 177. As such, we look at the contract language objectively, asking "what a reasonably prudent person in the same position would have understood as to the meaning of the agreement." *Falls Garden*, 441 Md. at 303 (quoting *Cochran*, 398 Md. at 17). "If the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran*, 398 Md. at 16. Nevertheless, "[a] contract is not ambiguous

24

merely because the parties do not agree as to its meaning." *Phoenix Servs. Ltd. P'Ship v. Johns Hopkins Hosp.*, 167 Md. App. 327, 392 (2006). Rather, "[t]he language of a contract is only ambiguous if, when viewed from [a] reasonable person perspective, that language is susceptible to more than one meaning. *Ocean Petroleum*, 416 Md. at 87. "To determine whether a contract is susceptible of more than one meaning, the court considers 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.'" *Phoenix Servs.*, 167 Md. App. at 392 (quoting *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985)). "Under the objective law of contracts, when a contract is clear and unambiguous, 'its construction is for the court to determine.'" *Phoenix Servs.*, 167 Md. App. at 391 (quoting *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251 (2001)).

Here, several factors suggest that the parties intended to be bound by the terms stated on the record. The court opened and closed the proceedings by expressing its pleasure "that the parties have reached an agreement," and neither counsel contradicted that. More importantly, Cromwell's counsel, Mr. Kagan, identified on the record all of the material terms of the settlement: (1) the sign would be lowered 11 or 12 feet, at Cromwell's "sole absolute discretion," which 4900 Park Heights "would try to accomplish . . . within 45 days" of the hearing; (2) each party would pay its own legal fees and 4900 Park Heights would pay the court costs; (3) the parties would modify the 2014 Declaration "so that all initial and future improvements, as defined therein, must be approved by Cromwell [], which shall be in the sole and absolute discretion of Cromwell"; (4) the parties would

25

dismiss the lawsuits without prejudice initially, and with prejudice later; and (5) each party would grant the other mutual releases. When asked whether he had "[a]ny modifications, additions, [or] deletions" to that list, Mr. Wood confirmed he did not. Neither of the parties identified any open terms, nor has 4900 Park Heights since identified any material term that was actually left open at that time. In addition, the context of the negotiations and presentation—with counsel appearing at what would have been the beginning of trial after communicating to the court that they had reached a settlement—strongly suggests an intent to be bound.

The sole factor pushing against that conclusion is that when Mr. Kagan informed the court that the parties would dismiss the litigation with prejudice if the sign had been relocated "within 45 days of today," Mr. Wood interjected: "And assuming also that we can agree on the language of the covenants and we can agree on the mutual release." Mr. Kagan responded: "Right." Mr. Kagan then confirmed that the parties were asking the court to dismiss the case without prejudice at that time, and that "once all the terms of the settlement agreement ha[d] been met"—that is, "following the completion of the lowering of the sign, as well as the other terms of the settlement agreement"—"the parties w[ould] then agree to file lines of dismissal with prejudice."

Ultimately, we need not determine whether Mr. Wood's single incongruous (yet uncontradicted) statement interjected ambiguity regarding the parties' intention to be bound, such that the circuit court should have taken evidence and made findings of fact on the issue. We may refrain from doing so because 4900 Park Heights conceded during oral

26

argument on the motion to enforce that it intended to be bound. Indeed, Mr. Wood acknowledged forthrightly that the parties "went into that courtroom to put on the record that we had settled the case." He then posed and answered the critical question: "So the question is did we intend to be bound? Yes, we intended to be bound[] . . . ." Although Mr. Wood then argued that the parties' subsequent difficulty in finalizing the written agreement called into question "what . . . we intend[ed] to be bound to," that is a separate issue (to which we will turn next). In light of 4900 Park Heights's concession that it intended to be bound by the terms placed on the record on March 28, we cannot conclude that the court erred in finding that it did.[6]

### B. The Circuit Court Did Not Err in Concluding that the Material Terms of the Agreement Were Sufficiently Definite to Be Enforceable.

In addition to reflecting an intent to be bound, a preliminary agreement also must be sufficiently definite in its terms to be enforced. "The 'indefiniteness of terms bears upon the solution of both' intent to be bound and definiteness of terms, because '[d]efiniteness may show finality and the presence of an intention to be bound.'" *Falls Garden*, 441 Md.

---

[6] 4900 Park Heights relies on the following language from *Cochran*: "[I]f the parties contemplate that an agreement between them shall be reduced to writing before it shall become binding and complete, there is no contract until that writing is signed." *See Cochran*, 398 Md. at 18. As relevant here, however, the critical part of that language is the portion that emphasizes the importance of the parties' intent as to *when* the settlement becomes binding. If the parties do not intend to be bound until a final written agreement is signed, then they will not be. If, however, they intend to be bound by the initial statement of terms, and those terms are sufficiently definite and comprehensive as to the material terms of the deal, then their agreement can be enforced without agreement on the language of the contemplated final settlement document.

27

at 304 (quoting *Corbin on Contracts* § 2.8, at 131). "If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable." *Stone v. Wells Fargo Bank, N.A.*, 361 F. Supp. 3d 539, 551 (D. Md. 2019) (citing *Mogavero v. Silverstein*, 142 Md. App. 259, 272 (2002)); *see also Falls Garden*, 441 Md. at 304 ("[E]ven if an intention to be bound is manifested by both parties, too much indefiniteness [of terms] may invalidate the agreement, because of the difficulty of administering the agreement." (quoting *Corbin on Contracts* § 2.8, at 131)). "Failure of parties to agree on an essential term of a contract may indicate that the mutual assent required to make a contract is lacking." *Falls Garden*, 441 Md. at 302 (quoting *Cochran*, 398 Md. at 14); *Advance Telecom*, 224 Md. App. at 177 (same).

"It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement." *Falls Garden*, 441 Md. at 305 (quoting *Corbin on Contracts* § 2.8, at 133-34). For that to occur, "it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document." *Id.* The final agreement then "is understood to be a mere memorial of the agreement already reached." *Id.* On the other hand, "[i]f the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called 'contract to make a contract' is not a contract at all." *Id.*

We agree with the circuit court that the terms placed on the record constituted all of the material terms of the parties' agreement, and that the statement of terms was sufficiently

28

definite to be enforceable. 4900 Park Heights asserts that two terms of the settlement were too indefinite to be enforceable. Analyzed more closely, however, its real contention is that "Cromwell's first draft of the Settlement Agreement *did not reflect the agreed upon preliminary terms* placed on the record at the March Hearing." (emphasis added). In other words, 4900 Park Heights's argument is not that the terms actually were ambiguous, but that Cromwell's draft did not properly reflect them. Thus, 4900 Park Heights argues, the terms must have been ambiguous or else the parties would not have had such difficulty agreeing to final settlement language. But parties may struggle to agree on the language of a final written agreement for reasons other than that the terms already agreed to are indefinite, including if one or both parties try to overreach or pull back from the agreed terms.

The first term with which 4900 Park Heights now takes issue is the parties' agreement to a "mutual general release." 4900 Park Heights contends that "although the parties agreed to a mutual general release at the March Hearing, Cromwell's draft general release . . . was written in an illusory manner and contradicted language in the same release purporting to release Park Heights." In other words, as 4900 Park Heights argued in the circuit court, "We never got the release, and to this day we don't have the release. It was a mutual, general release, and we weren't given a mutual general release."

We find no ambiguity or indefiniteness in the term "mutual general release," which is a common and unambiguous phrase among legal practitioners. *Black's Law Dictionary* defines a "general release" as:

> A broad release of legal claims that is not limited to a particular claim or set of claims, such as those at issue in a pending or contemplated lawsuit, but instead covers any actual or potential claim by the releasing party against the released party based on any transaction or occurrence before the release.

*General release*, Black's Law Dictionary (11th ed. 2019). *Black's* defines "mutual release" as "[a] simultaneous exchange of releases of legal claims held by two or more parties against each other." *Mutual release*, Black's Law Dictionary (11th ed. 2019). A mutual general release is thus a general release that is given simultaneously by and in favor of multiple parties. *See, e.g.*, *Convey Compliance Sys. v. 1099 Pro, Inc.*, 443 F.3d 327, 329 (4th Cir. 2006) (settlement agreement at issue "included mutual general releases of all claims between [the parties], 'known or unknown, arising out of any actions or events occurring in whole or part prior to or concurrent with the date' of the settlement"); *Va. Impression Prods. Co. v. SCM Corp.*, 448 F.2d. 262, 264-65 (4th Cir. 1971) (holding that language of mutually exchanged releases was broad enough to evidence parties' intent to agree to mutual general releases). We see no error in the circuit court's determination that the parties' agreement to a mutual general release was sufficiently definite to be enforceable.[7]

The second term with which 4900 Park Heights takes issue is the modification of the 2014 Declaration. As stated during the March 28 hearing:

> The parties agree to modify the declaration of covenants and restrictions recorded among the land records of Anne Arundel County in Liber 27109,

---

[7] Instead of simply enforcing the parties' agreement to a "mutual general release," the circuit court enforced 4900 Park Heights's draft language for such a release. Cromwell did not appeal from the court's decision to adopt that language. As a result, we have no occasion to consider whether the court erred in doing so.

Folio 211, so that all initial and future improvements, as defined therein, must be approved by Cromwell Retail 1, LLC, which shall be in the sole and absolute discretion of Cromwell Retail 1, LLC. And I believe that declaration is dated January 16th of 2014.

As with the mutual general release, 4900 Park Heights's primary argument regarding the alleged indefiniteness of this term has nothing to do with any ambiguity regarding the term as it was placed on the record. Instead, 4900 Park Heights points to the parties' *post*-March 28 negotiations, which it contends "emphatically indicate[d] that . . . the general terms placed on the record at the March Hearing were far from clear and definite." Specifically, 4900 Park Heights contends that Cromwell's initial draft of the amendments to the 2014 Declaration was overreaching, and that 4900 Park Heights's counterproposal sought to pull it back. Notably, however, 4900 Park Heights's response was based not on the term placed on the record, but on "the understanding of Park Heights' Representative that Cromwell's sole and absolute discretion over certain future improvements would only apply to Park Heights, not to future purchasers of the Property."

While difficulty reaching agreement on final settlement language *can* suggest a lack of agreement on material terms of a settlement, a court should not resort to extrinsic evidence to find ambiguity that does not appear in the contractual terms themselves. *See Ocean Petroleum*, 416 Md. at 86; *Phoenix Servs.*, 167 Md. App. at 392. We agree with the circuit court that the parties' agreement to amend the 2014 Declaration was not ambiguous or indefinite, and so the court did not err in declining to consider extrinsic evidence.

The 2014 Declaration treated initial and future improvements differently with respect to Cromwell's right of approval:

4. **Initial Improvements to Property**. [Cromwell] shall have the right, in its <u>sole and absolute discretion</u>, to approve or disapprove all aspects of the initial improvements constructed upon the Property and all material modifications to such improvements thereafter (collectively, the **"Initial Improvements"**). [Cromwell]'s right of approval includes, but is not limited to, all architectural design elements, exterior materials, colors and elevations, signage, and landscaping, and all future material revisions thereto.

5. **Future Improvements**. [Cromwell] shall have the right, in its <u>reasonable</u> discretion, to approve or disapprove all aspects of the improvements made to the Property after completion of the Initial Improvements (the **"Future Improvements"**). [Cromwell]'s right of approval includes, but is not limited to, all architectural design elements, exterior materials, colors and elevations, signage, and landscaping, and all future material revisions thereto. The standard of [Cromwell]'s approval shall be reasonable so long as the Future Improvements are consistent with the Initial Improvements. Notwithstanding the foregoing, in the event that any Future Improvements are materially different from the Initial Improvements, then the standard for [Cromwell]'s right to approve or disapprove the Future Improvements shall be in its <u>sole and absolute discretion</u>.

In settling their dispute, the parties agreed to modify the declaration "so that all initial and future improvements, as defined therein, must be approved by Cromwell Retail 1, LLC, which shall be in the sole and absolute discretion of Cromwell." The parties thus clearly and unambiguously identified their intent to change Cromwell's right to approve or disapprove future improvements from an exercise of "reasonable discretion" to "sole and absolute discretion." That is the identical standard that was already in place for initial improvements, per paragraph 4, and for future improvements that "are materially different from the Initial Improvements," per the final sentence of paragraph 5. The settlement did not purport to adjust or leave open to doubt any other aspect of the declarations.

In contending that there was ambiguity in the term related to amendment of the 2014 Declaration *as it was placed on the record*, 4900 Park Heights relies entirely on a

clarification made in response to a question from the court. After Mr. Kagan stated that the parties had agreed to modify the 2014 Declaration, the court inquired whether the 2014 Declaration was "only amended vis-à-vis 4900 [Park Heights]? Or are there other present owners that would be incorporated within that?" Mr. Kagan responded that "it just applies to the particular lot that the Sofa Store is on." Mr. Kagan then continued: "And the declarant in that declaration is Cromwell Retail 1, LLC, but it applies specifically to the lot of the Sofa Store, or the Plaintiff in this case."

4900 Park Heights seizes on the final six words in Mr. Kagan's statement—"or the Plaintiff in this case"—and contends that they render ambiguous whether the change to the 2014 Declaration was intended to apply only to 4900 Park Heights or to successive purchasers. We see no ambiguity. The declaration is a covenant running with the land, the purpose of which is to bind future owners of the property.[8] *See County Comm'rs v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 448-49 (2001); *cf.* 21 C.J.S. *Covenants* § 38 (2020). Moreover, Mr. Kagan's answer stated clearly that the declaration applied to the property—the "lot"—not just its current owner.

In sum, we find no error in the circuit court's determination that the parties placed the material terms of the settlement on the record and that those terms were sufficiently definite to be enforceable.

---

[8] By its express terms, the 2014 Declaration applies not to any specific individual or entity, but to "the record owner, whether one or more persons or entities, of the fee simple title to any portion of the Property," whoever that may be at any point in time.

**III. IN ONE RESPECT, THE COURT IMPROPERLY MODIFIED THE MARCH SETTLEMENT TERMS.**

4900 Park Heights lastly contends that, assuming there was an enforceable settlement agreement, the court improperly modified the terms entered into the record at the March hearing by adopting Cromwell's version of the amendment to the 2014 Declaration. We agree, in part.

A trial court has "wide latitude" when entering a settlement order. *See Smith v. Luber*, 165 Md. App. 458, 467 (2005). A court cannot, however, enter a settlement order in which the terms vary from, or otherwise fail accurately to reflect, those to which the parties have agreed. *See id.* at 479.

Paragraph 5 of the 2014 Declaration provided:

> 5. **Future Improvements**. [Cromwell] shall have the right, in its <u>reasonable</u> discretion, to approve or disapprove all aspects of the improvements made to the Property after completion of the Initial Improvements (the **"Future Improvements"**). [Cromwell]'s right of approval includes, but is not limited to, all architectural design elements, exterior materials, colors and elevations, signage, and landscaping, and all future material revisions thereto. The standard of [Cromwell]'s approval shall be reasonable so long as the Future Improvements are consistent with the Initial Improvements. Notwithstanding the foregoing, in the event that any Future Improvements are materially different from the Initial Improvements, then the standard for [Cromwell]'s right to approve or disapprove the Future Improvements shall be in its <u>sole and absolute discretion</u>.

The parties agreed to modify the declaration "so that all . . . future improvements, *as defined therein*, must be approved by Cromwell Retail 1, LLC, which shall be in the sole and absolute discretion of Cromwell." (Emphasis added). In enforcing the settlement, the court approved an amendment drafted by Cromwell that, in operative part, provided:

34

5.      **Future Improvements**.  [Cromwell] shall have the right, in its sole and absolute discretion[], to approve or disapprove all aspects of the improvements made to the Property after completion of the Initial Improvements (the "**Future Improvements**").   [Cromwell]'s right of approval includes, but is not limited to, all architectural design elements, exterior materials, colors and elevations, signage, and landscaping.

4900 Park Heights complains that this revision "removes critical language from the 2014 Declaration that the parties never agreed to change."  Specifically, 4900 Park Heights contends that the approved amendment improperly "removes language that limited the scope of Cromwell's right of approval only to improvements and 'future material revisions thereto.'"  4900 Park Heights asserts that it never agreed to give up the right to make non-material revisions to improvements without Cromwell's approval.  We agree.

The settlement term placed on the record adopted by reference the definition of future improvements in the 2014 Declaration.  In identifying the scope of improvements that are covered, the original paragraph 5 contains a non-exhaustive list of improvements over which Cromwell has approval authority.  That list includes "all future material revisions thereto."  In approving language that omitted that phrase, the court expanded Cromwell's approval authority beyond the terms of the parties' agreement.[9]  Doing so was an abuse of discretion.  On remand, the court should approve language of a revised declaration only if it adheres in full to the definition of Future Improvements included in the 2014 Declaration, including the original list of examples.

---

[9] Notably, the new language drafted by Cromwell and approved by the circuit court gives Cromwell greater approval authority with respect to revisions to future improvements than it enjoys (pursuant to paragraph 4) with respect to revisions to initial improvements. Nothing about the settlement terms the parties placed on the record suggests such an intent.

4900 Park Heights also complains that the amended declaration now includes a new paragraph, which states: "Standard of Approval and Disapproval. The Parties agree that [Cromwell] may approve or disapprove all Initial Improvements and Future Improvements in [Cromwell's] sole and absolute discretion." In explaining its objection to that paragraph, however, 4900 Park Heights relies on the removal of language regarding "future material revisions." Shorn of that deficiency, this new paragraph reflects nearly word-for-word the parties' agreement.

4900 Park Heights also argues that the amended declaration "simply should have substituted 'sole and absolute discretion' for 'reasonable discretion' in the 2014 Declaration." Further changes were necessary, however, because neither of the final two sentences in paragraph 5 of the 2014 Declaration would have made any sense in light of the change making "sole and absolute discretion" the standard for Cromwell's review of all future improvements.

We will therefore vacate in part the circuit court's order enforcing the settlement agreement and remand to that court with instructions to enter an order enforcing the settlement terms only once the amendment to the 2014 Declaration is corrected by reinserting the phrase "and all future material revisions thereto."

36

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 75% BY APPELLANT AND 25% BY APPELLEE.**